687 F.2d 778
 72 A.L.R.Fed. 79, Fed. Sec. L. Rep. P 98,789
 WALCK, Lynn G., Plaintiff on behalf of himself and
representatively on behalf of himself and others
similarly situated
v.
AMERICAN STOCK EXCHANGE, INC. and New York Stock Exchange,
Inc., Lynn G. Walck, Appellant in No. 82-1051.
WALCK, Lynn G., Plaintiff on behalf of himself and
representatively on behalf of himself and others
similarly situated
v.
AMERICAN STOCK EXCHANGE, INC. and New York Stock Exchange,
Inc., Appellants in No. 82-1052.
 Nos. 82-1051, 82-1052.
 United States Court of Appeals,
Third Circuit.
 Argued Aug. 2, 1982.
Decided Sept. 1, 1982.
Rehearing and Rehearing En Banc Denied Sept. 27, 1982.
 
 Edwin P. Rome (argued), William E. Taylor, III, Victor A. Young, Alexander D. Bono, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for appellant-cross-appellee Lynn G. Walck.
 Joseph A. Torregrossa, John R. McConnell, Morgan, Lewis & Bockius, Philadelphia, Pa., Peter A. Copeland, Russell E. Brooks (argued), Milbank, Tweed, Hadley & McCloy, New York City, for appellee-cross-appellant New York Stock Exchange, Inc.
 Raymond K. Denworth, Jr., Edward M. Posner, Drinker Biddle & Reath, Philadelphia, Pa., Banks Brown, John J. Loflin, Lord, Day & Lord, New York City, for appellee-cross-appellant American Stock Exchange, Inc.
 Before ALDISERT and WEIS, Circuit Judges, and RE, Chief Judge.*
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 The plaintiff appeals from a judgment on the pleadings in favor of the defendants, the New York Stock Exchange and the American Stock Exchange, in an action under federal securities law. The major questions presented are whether §§ 6 and 7 of the Securities Exchange Act of 1934 implicitly authorize private civil actions for damages against a registered stock exchange based on failure to enforce its own rules and federal margin requirements. We also must consider claims brought under §§ 9 and 10 of the Exchange Act, SEC Rule 10b-5, rules promulgated by the appellee Exchanges, and Pennsylvania common law. We hold that Congress did not create private rights of action by implication in §§ 6 and 7, that neither Congress nor the Exchanges implicitly authorized private actions against an Exchange for failure to enforce its own rules, that the complaint fails to state a claim under § 10 and Rule 10b-5, that the § 9 claim is barred by the time limitation of § 9(e), and that the district court properly dismissed the pendent state claims; and we affirm the judgment below in all respects.
 
 I.
 
 2
 Because the case comes to us on appeal from a judgment on the pleadings pursuant to Rule 12(c), F.R.Civ.P., we assume the truth of all material allegations of the complaint.[1] Appellant Lynn G. Walck was a customer of the securities brokerage firm of Edwards & Hanly (E&H), now bankrupt, which was a member of the appellee New York and American Stock Exchanges. E&H in 1969 began to promote aggressively the purchase of Trans-Lux Corporation common stock, recommending to Walck and other customers that they utilize the full amount of margin purchasing power available in their accounts for this purpose.[2] E&H sold numerous shares of Trans-Lux; between March 1971 and June 1973 the number of Trans-Lux shares in E&H accounts increased from 151,637 to 500,406, and its share of Trans-Lux equity from 14.95% to 24.6%.[3]
 
 
 3
 The price of Trans-Lux stock began an extended and steady decline in early 1973, causing a number of E&H accounts to become under-margined. E&H requested additional margin deposits of numerous customers in May 1973, but several customers, including Walck, failed to meet the call. E&H continued to send margin calls, but it liquidated none of the accounts holding Trans-Lux. In August 1973, as the market for Trans-Lux continued to decline, E&H began searching for a buyer to purchase in a block the shares in its under-margined accounts; and in January 1974 it sold 146,300 shares to the Trans-Lux Corporation at a substantial loss. After E&H credited its customers' accounts with the proceeds of the sale, there remained an aggregate $506,429 debit balance in the accounts sold out; and E&H thereafter attempted to collect the deficiencies from its customers.[4]
 
 
 4
 Walck filed an action against E&H in March 1974, alleging violations of the Securities Act of 1933, the Securities Exchange Act of 1934, SEC Rule 10b-5, Federal Reserve Board Regulation T, and common law. Walck v. Edwards & Hanly, Civ. No. 74-664 (E.D.Pa. filed March 19, 1974). In September 1975, before the case came to trial, E&H petitioned for reorganization under Chapter XI of the Bankruptcy Code. The Bankruptcy Court then stayed further prosecution of Walck's action against E&H. In re Edwards & Hanly, Bank.No. 76 B 1807-G (S.D.N.Y. Sept. 15, 1976) (stay order).
 
 
 5
 Frustrated in his attempt to obtain relief from E&H, Walck commenced the present action against the appellee Exchanges, seeking actual and punitive damages on January 13, 1977. He alleges inter alia that appellees violated § 6 of the Exchange Act by failing to enforce their own rules against E&H, that they violated § 7 by failing to enforce Regulation T, and that they violated and aided and abetted violations by E&H of §§ 9 and 10(b) and Rule 10b-5. The complaint avers that the Exchanges were aware of the "enormous concentration in Trans-Lux shares in (E&H) customer accounts" as early as January 1971; and it charges that between 1971 and 1974 E&H and appellees "intentionally, willfully and deliberately with scienter" failed to notify and "affirmatively concealed" from E&H's customers that E&H was accumulating a large and illiquid block of Trans-Lux stock in their accounts, that many of the accounts were under-margined because of the concentrations of Trans-Lux stock therein, that Trans-Lux was in violation of several Exchange Rules relating to margin collateral and supervision and suitability of customer purchases, and that the market price of Trans-Lux stock was being further depressed by E&H's efforts to liquidate its under-margined accounts in a block.
 
 
 6
 The district court granted appellant's motion for class certification but thereafter, by orders entered May 15 and December 18, 1981, granted appellees' motion for judgment on the pleadings and dismissed the complaint. Citing recent Supreme Court decisions, the court rejected Walck's arguments that §§ 6 and 7 of the Exchange Act and the Rules of the Exchanges implicitly authorize private damages actions. It dismissed the § 10(b)-Rule 10b-5 claim on the grounds that the Exchanges have no independent duty to disclose member violations to their customers and that the Exchanges cannot be held liable as aiders and abettors because their alleged assistance comprised "mere inaction or silence." It denied appellees' motion for summary judgment on the § 9 claim, finding triable factual issues material to the question of tolling the statute of limitations; but it thereafter dismissed this claim for the same reasons that had led to dismissal of the § 10(b) claim. Having dismissed all of appellant's federal claims pursuant to Rule 12(c), the court declined to exercise pendent jurisdiction over Walck's common law fraud and contract claims and dismissed the complaint in its entirety. Walck appeals on behalf of himself and the class. We have jurisdiction under 28 U.S.C. § 1291.
 
 II.
 
 7
 The first question is whether an investor has an implied right of action for damages against a registered stock exchange under § 6 of the Exchange Act, 15 U.S.C. § 78f, based on the failure of the exchange to enforce its own rules. Because all relevant events concluded in 1974, we apply the statute as it then existed and not as amended in 1975.[5] The central inquiry is whether Congress intended to create a private damages remedy by implication, "not one of whether this Court thinks that it can improve upon the statutory scheme that Congress enacted into law," Touche Ross & Co. v. Redington, 442 U.S. 560, 578, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82 (1979); and our primary tool for determining congressional intent is the four-factor test enunciated in Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975). See Redington, 442 U.S. at 575-76, 99 S.Ct. at 2488-2489; Zeffiro v. First Pennsylvania Banking and Trust Co., 623 F.2d 290, 296 (3d Cir. 1980), cert. denied, --- U.S. ----, 102 S.Ct. 2295, 73 L.Ed.2d ---- (1982).
 
 A.
 
 8
 Section 6[6] provides for SEC registration of any securities exchange that complies with stated requirements, upon a finding that it "is so organized as to be able to comply with the provisions of this title and the rules and regulations thereunder and that the rules of the exchange are just and adequate to insure fair dealing and to protect investors." The exchange's rules must provide "for the expulsion, suspension, or disciplining of a member for conduct or proceeding inconsistent with just and equitable principles of trade," and it must agree "to comply, and to enforce so far as is within its powers compliance by its members, with the provisions of this title ... and any rule or regulation ... thereunder." Compliance with § 6 is mandated by § 5, 15 U.S.C. § 78e, which forbids securities transactions on an unregistered exchange.
 
 
 9
 Appellant contends that an investor injured by an exchange's violation of the registration requirements of § 6-more precisely, by the exchange's failure to enforce its own rules against an errant member broker-has an implied right of action under that section to recover his damages from the exchange. We turn to that contention.
 
 B.
 
 10
 In Cort v. Ash the Court stated that "several factors are relevant" in determining whether Congress has created a private remedy by implication:
 
 
 11
 First, is the plaintiff "one of the class for whose especial benefit the statute was enacted,"-that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?
 
 
 12
 422 U.S. at 78, 95 S.Ct. at 2087 (citations omitted). The Court has modified this test in more recent decisions, chiefly by emphasizing that although each of the factors is relevant, they are not necessarily "entitled to equal weight," Redington, 442 U.S. at 575, 99 S.Ct. at 2488, and that the test was not designed for mechanical application but as a tool to be employed in the paramount inquiry after Congress' intent, see, e.g., California v. Sierra Club, 451 U.S. 287, 293, 101 S.Ct. 1775, 1778, 68 L.Ed.2d 101 (1981); Redington, 442 U.S. at 575-76, 99 S.Ct. at 2488-2489. With these modifications in mind, we now consider application of the Cort standards to § 6.
 
 1.
 
 13
 The first factor unambiguously supports appellant's position; there can be no doubt that § 6 was enacted for the "especial benefit" of investors. As in Cannon v. University of Chicago, 441 U.S. 677, 689, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979), "(t)hat question is answered by looking to the language of the statute itself": § 6(d) requires the SEC, as a precondition to registration of an exchange, to find its rules "just and adequate to insure fair dealing and to protect investors."[7] See also §§ 6(a)(2), 6(b); see generally Lank v. New York Stock Exchange, 548 F.2d 61 (2d Cir. 1977); Baird v. Franklin, 141 F.2d 238, 244-45 (2d Cir.) (Clark, J., dissenting in part), cert. denied, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944). This factor alone is insufficient to maintain the inference, however, no matter how clearly it favors the plaintiff. "(T)he mere fact that the statute was designed to protect (investors) does not require the implication of a private cause of action for damages on their behalf.... The dispositive question remains whether Congress intended to create any such remedy." Transamerica Mortgage Advisors v. Lewis, 444 U.S. 11, 24, 100 S.Ct. 242, 249, 62 L.Ed.2d 146 (1979) (citations omitted).
 
 2.
 
 14
 Turning to the second factor, we look for evidence of "legislative intent, explicit or implicit, either to create such a remedy or to deny one." Both sides concede that the 1934 legislative history offers no express evidence of Congress' intent. Congress in 1934 did, however, expressly create private rights of action in §§ 9(e), 16(b), and 18 of the Exchange Act. "Obviously, then, when Congress wished to provide a private damages remedy, it knew how to do so and did so expressly." Redington, 442 U.S. at 572, 99 S.Ct. at 2487. We do not treat this factor alone as conclusive, but we must recognize that the express provision of private remedies has been treated in numerous decisions as strong evidence of congressional intent not to create additional private remedies by implication. E.g., Middlesex County Sewerage Authority v. National Sea Clammers Association, 453 U.S. 1, 14-15, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1981); Transamerica, 444 U.S. at 19-21, 100 S.Ct. at 246-247; Redington, 442 U.S. at 571-74, 99 S.Ct. at 2486-2488; National Railroad Passenger Corp. v. National Association of Railroad Passengers, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974); T.I.M.E. Inc. v. United States, 359 U.S. 464, 470-71, 79 S.Ct. 904, 908, 3 L.Ed.2d 952 (1959).
 
 3.
 
 15
 The third Cort factor is less clear, but we think it also weighs against the inference. We note preliminarily that although Cort inquired whether an implied remedy was "consistent with the underlying purposes of the statutory scheme," later decisions demonstrate that more than mere "consistency" is required to lend much support to an inference. In Piper v. Chris-Craft Industries, 430 U.S. 1, 25, 26, 97 S.Ct. 926, 941, 51 L.Ed.2d 124 (1977), for example, the Court inquired whether "congressional purposes are likely to be undermined absent private enforcement" or the proposed implied right of action "is necessary to effectuate Congress' goals." In Cannon v. University of Chicago, 441 U.S. 677, 703, 99 S.Ct. 1946, 1960, 60 L.Ed.2d 560 (1979), the Court considered whether an implied remedy would be "necessary or at least helpful to the accomplishment of the statutory purpose."
 
 
 16
 Appellant advances the thesis that a private right of action against a stock exchange for failure to enforce its own rules is a necessary adjunct to SEC enforcement if the congressional objective of protecting investors is to be achieved. He points out that prior to 1975 the only sanctions available to the Commission to enforce § 6 were withdrawal or suspension for up to twelve months of an exchange's registration and expulsion or suspension of a member or officer of the exchange. See § 19, 15 U.S.C. § 78s (1970) (amended 1975). These sanctions are so severe that they are not likely to be imposed in the absence of a serious default. Therefore, appellant suggests, SEC enforcement is inadequate and Congress' purposes will be undermined if we refuse to authorize injured investors to seek damages from the exchanges in the event of a lesser violation.
 
 
 17
 a.
 
 
 18
 The argument fails for two distinct but related reasons. First, the major premise of appellant's position, that the sanctions available to the SEC are so draconian as to be insufficient to serve the purposes of the legislation, was presented to and carefully examined by Congress itself during its extensive consideration of the 1975 Exchange Act amendments. The SEC in 1971 recommended to Congress that it be given authority to enforce a self-regulatory body's rules by proceeding directly against its members, arguing that "(t)he Commission's power to withdraw the registration of a stock exchange or of the NASD in the event that they do not enforce their rules is so extreme that it does not present a viable regulatory tool." SEC, Study of Unsafe and Unsound Practices of Brokers and Dealers, H.R.Doc.No.231, 92d Cong., 1st Sess. 7 (1971). Congress, however, was not persuaded by this argument. The Subcommittee on Securities, relying in part on an earlier SEC study, found the proposal unnecessary because "the Commission already ha(d) the power to accomplish much of what this new authority would allow" by virtue of its existing rule-making powers under the Act. Report of the Subcommittee on Securities of the Senate Committee on Banking, Housing and Urban Affairs, 93d Cong., 1st Sess., Securities Industry Study (Comm. Print 1973) 177 (hereinafter Senate Study). It also pointed to "respectable opinion that the grant of authority to the Commission to enforce self-regulatory rules would be undesirable." Id. at 177-78. Quoting testimony of the Chairman of the American Stock Exchange, the Subcommittee suggested that the SEC's proposal would lead to "fractionalized" enforcement responsibility "and that such a step would violate the tenets of both good management and good government which hold that responsibility should be clearly and unequivocably (sic) assigned." Id. at 178. The full Congress thereafter adopted amendments to § 19 expanding the Commission's power by authorizing it "to censure or impose limitations upon the activities, functions, and operations" of an exchange,[8] but it followed the Subcommittee's recommendation that it deny the SEC's request for direct authority to enforce exchange rules.
 
 
 19
 Congress in 1975 thus carefully considered the adequacy of existing enforcement mechanisms and made some changes therein, but it largely rejected the SEC's request for additional authority on the ground that "fractionalized" enforcement responsibility "would violate the tenets of both good management and good government." Repeating essentially the SEC argument that Congress rejected, appellant now proposes that we set aside Congress' considered judgment as to the adequacy of the statutory means of enforcement to achieve its goals. Appellant thus asks us not to effectuate Congress' intent, but to "improve upon the statutory scheme that Congress enacted into law." Redington, 442 U.S. at 578, 99 S.Ct. at 2490.
 
 
 20
 b.
 
 
 21
 An even more fundamental difficulty with appellant's position, however, is that he asks us to adopt too simplistic a reading of the legislative purposes. Certainly Congress sought to protect investors by enacting § 6; but it specifically declined to enact a comprehensive regulatory code or to authorize detailed governmental oversight of the workings of the exchanges. It instituted instead a system of exchange "self-regulation" subject to limited governmental oversight.[9] As the Supreme Court explained in Silver v. New York Stock Exchange, 373 U.S. 341, 352, 83 S.Ct. 1246, 1254, 10 L.Ed.2d 389 (1963),
 
 
 22
 The pattern of governmental entry ... was by no means one of total displacement of the exchanges' traditional process of self-regulation. The intention was rather, as Mr. Justice Douglas said, while Chairman of the S.E.C., one of "letting the exchanges take the leadership with Government playing a residual role. Government would keep the shotgun, so to speak, behind the door, loaded, well oiled, cleaned, ready for use but with the hope it would never have to be used." Douglas, Democracy and Finance (Allen ed. 1940), 82. Thus the Senate Committee Report stressed that "the initiative and responsibility for promulgating regulations pertaining to the administration of their ordinary affairs remain with the exchanges themselves. It is only where they fail adequately to provide protection to investors that the Commission is authorized to step in and compel them to do so." S.Rep.No.792, (73d Cong., 2d Sess. 13 (1934) ).
 
 
 23
 See generally id. at 349-55, 83 S.Ct. at 1252-1255. Congress deliberately chose self-regulation over governmental preemption to serve several important policies. In addition to the primary consideration that wide-scale government regulation would be expensive and ineffective, Congress found that "self-regulation has significant advantages in its own right." Inter alia,
 
 
 24
 self-regulation may make the members of the securities industry more aware of the goals of regulation and their own stake in them while at the same time making the imposition of regulatory controls more palatable. The most important advantage of self-regulation, however, is its potential for establishing and enforcing what Mr. Justice Douglas referred to as "ethical standards beyond those any law can establish." As he stated:
 
 
 25
 Self-regulation ... can be pervasive and subtle in its conditioning influence over business practices and business morality. By and large, government can operate satisfactorily only by proscription. That leaves untouched large areas of conduct and activity; some of it susceptible of government regulation but in fact too minute for satisfactory control; some of it lying beyond the periphery of the law in the realm of ethics and morality. Into these larger areas self-government and self-government alone, can effectively reach.
 
 
 26
 Senate Study at 149 (footnotes omitted). "The Congress has always recognized that the practicality and positive advantages of self-regulation must be balanced against its fundamental weaknesses and limitations." Id. Under the circumstances, we think it "highly improbable that 'Congress absentmindedly forgot to mention an intended private action' "-not only in 1934, but again in 1975. Transamerica, 444 U.S. at 20, 100 S.Ct. at 247 (quoting Cannon, 441 U.S. at 742, 99 S.Ct. at 1981 (Powell, J., dissenting)). See also Ash v. Cort, 496 F.2d 416, 428 (3d Cir. 1974) (Aldisert, J., dissenting), rev'd, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). The clear implication of the legislative history is that Congress has carefully studied and "balanced" the competing considerations and enacted the statutory schema that in its view would best serve its various goals of promoting transactional efficiency, fair dealing, and investor protection, and of limiting expensive and ineffective federal intervention. We cannot infer in the face of all this evidence that Congress nonetheless authorized by implication authority in the federal courts to intervene in the self-regulatory system at the instance of an injured investor and grant redress in the form of a monetary award against an exchange, conditioned on its failure to enforce its own rules, for the purpose of coercing or encouraging enforcement.
 
 C.
 
 27
 We therefore conclude that application of the Cort v. Ash standards demonstrates a clear congressional intent not to create a private damages remedy in § 6. "(T)he inquiry ends there: The question whether Congress, either expressly or by implication, intended to create a private right of action, has been definitely answered in the negative." Redington, 442 U.S. at 576, 99 S.Ct. at 2489.[10]
 
 III.
 
 28
 Appellant also argues, relying on Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, --- U.S. ----, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), that we should recognize in the 1975 Securities Acts Amendments an intent to preserve an implied remedy in § 6 previously recognized in "numerous court decisions." This argument fails for several reasons. First, as we have noted, all of the events underlying this action occurred prior to enactment of the 1975 Amendments, so that this case is controlled by the unamended statute. Although the 1975 debate is a matter of relevant historical fact and thus appropriate to our consideration of Congress' evaluation of SEC sanctions, we do not think it proper to find by reference to the actions of its 1975 successor that Congress in 1934 intended to create a remedy by implication.
 
 
 29
 Second, even if we held the "preservation" theory of Curran applicable to pre-amendment transactions such as these, this case lacks the factual predicate necessary for its application. In Curran the Court found that "the federal courts routinely and consistently had recognized an implied private cause of action" prior to the amendments in question, id. at ----, 102 S.Ct. at 1839, and therefore that the inference that the unamended statute authorized private actions was "a part of the 'contemporary legal context' in which Congress legislated," id. at ----, 102 S.Ct. at 1841. Here, however, notwithstanding appellant's assertion that "numerous court decisions" have recognized an implied remedy in § 6, his citations of authority and our own research have disclosed only one appellate decision prior to 1975 recognizing such a remedy. Baird v. Franklin, 141 F.2d 238 (2d Cir.), cert. denied, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944).[11] Indeed, we have found only one other reported decision permitting a plaintiff to go to trial on a § 6 claim. Pettit v. American Stock Exchange, 217 F.Supp. 21 (S.D.N.Y.1963). Under these circumstances it would be inappropriate for us to say, as the Supreme Court said in Curran, that before 1975 "the consensus of opinion concerning the existence of a private cause of action under (§ 6) ... was equally (as) uniform and well understood" as that concerning § 10(b) and Rule 10b-5, --- U.S. at ----, 102 S.Ct. at 1840.
 
 
 30
 Third, the Court in Curran relied on affirmative evidence, found in the legislative history of the pertinent amendments, that Congress was aware of and intended to preserve the implied remedy in question. Here, by contrast, appellant has not cited and we have not discovered any affirmative indication in the records of the extensive seven-year study and evaluation of the Exchange Act that led to the 1975 Amendments that Congress was even aware of-much less intended to preserve-the remedies inferred in the Baird and Pettit decisions.[12]
 
 
 31
 Given the dearth of judicial authority and the absence of any evidence in the legislative history that Congress was even aware of the Baird and Pettit decisions, we cannot find that an implied right of action under § 6 was "a part of the 'contemporary legal context' in which Congress legislated" in 1975, id. at ----, 102 S.Ct. at 1841. Thus the inference that "Congress intended to preserve the preexisting remedy," id. at ----, 102 S.Ct. at 1839, even if it were applicable to pre-amendment transactions, would not be available in this case.
 
 IV.
 
 32
 Appellant next contends that he has an implied right of action under the Exchanges' Rules themselves,[13] without regard to § 6, arguing that Congress so intended. We reject this contention for the reasons stated in Part II. See also Jablon v. Dean Witter & Co., 614 F.2d 677, 679-81 (9th Cir. 1980). In addition, appellant overlooks the reality that the Exchanges and not Congress promulgated the rules; and we perceive no basis for an inference that the Exchanges in their quasi-legislative capacity intended to subject themselves to damages for non-enforcement.
 
 V.
 
 33
 A somewhat more substantial question is presented by appellant's contention that he has an implied private remedy pursuant to § 7 of the Exchange Act, 15 U.S.C. § 78g, and Federal Reserve Board Regulation T, 12 C.F.R. §§ 220.1 et seq., which regulate margin accounts in securities.[14] We have previously reserved the question, Jennings v. Boenning & Co., 523 F.2d 889 (3d Cir. 1975) (per curiam); but we now hold, applying the analysis of Cort v. Ash and its progeny in light of the 1970 amendment to § 7, that Congress did not authorize private actions to enforce the statute or the regulation.
 
 
 34
 First, § 7 was not enacted for the especial benefit of investors. By its own terms § 7 requires the Federal Reserve Board to impose margin requirements "(f)or the purpose of preventing the excessive use of credit for the purchase or carrying of securities," 15 U.S.C. § 78g(a). The congressional purpose is further explained in the legislative history:The main purpose of these margin provisions in section 6 is not to increase the safety of security loans for lenders. Banks and brokers normally require sufficient collateral to make themselves safe without the help of law. Nor is the main purpose even protection of the small speculator by making it impossible for him to spread himself too thinly-although such a result will be achieved as a byproduct of the main purpose.
 
 
 35
 The main purpose is to give a Government credit agency an effective method of reducing the aggregate amount of the nation's credit resources which can be directed by speculation into the stock market and out of other more desirable uses of commerce and industry-to prevent a recurrence of the pre-crash situation where funds which would otherwise have been available at normal interest rates for uses of local commerce, industry, and agriculture, were drained by far higher rates into security loans and the New York call market.
 
 
 36
 H.R.Rep.No.1383, 73d Cong., 2d Sess. 709 (1934). The pre-Cort cases that inferred a private remedy in § 7 likewise recognized that investor protection was "only incidental to the protection of the overall economy from excessive speculation," Pearlstein v. Scudder & German, 429 F.2d 1136, 1140 (2d Cir. 1970), cert. denied, 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971) (Pearlstein I); see also Remar v. Clayton Securities Corp., 81 F.Supp. 1014, 1017 (D.Mass.1949). But see Stern v. Merrill Lynch, 603 F.2d 1073, 1098-99 (4th Cir. 1979) (Butzner, J., dissenting) (arguing that the 1934 legislative history of § 7 discloses a "dual intent" to regulate credit and to protect investors).
 
 
 37
 Second, appellant concedes that the legislative history does not express a congressional intent to create a remedy; and the inference that it did not, arising from the express provisions of §§ 9, 16, and 18, applies equally to § 7 as to § 6.[15] Third, we see no reason to hold (and appellant does not argue) that private enforcement, particularly against the exchanges, is necessary to achieve Congress' goals.
 
 
 38
 Finally, most of the decisions inferring an action in § 7 predate the 1970 amendment which added § 7(f), which makes it "unlawful" for the investor "to obtain, receive, or enjoy" a loan in violation of the margin requirements. Securities Exchange Act of 1934, Pub.L.No.91-508, § 301(a), 84 Stat. 1124 (codified at 15 U.S.C. § 78(g)(1) (1976)). Subsequent decisions have found the amendment probative of congressional intent to deny investors a damages remedy for their brokers' violations. E.g., Gutter v. Merrill Lynch, 644 F.2d 1194, 1197-99 (6th Cir. 1981), cert. denied, --- U.S. ----, 102 S.Ct. 1256, 71 L.Ed.2d 447 (1982); Stern v. Merrill Lynch, 603 F.2d at 1080-82; Utah State University v. Bear, Stearns & Co., 549 F.2d 164, 170 (10th Cir.), cert. denied, 434 U.S. 890, 98 S.Ct. 264, 54 L.Ed.2d 176 (1977); cf. Pearlstein II, 527 F.2d 1141, 1145 n.3 (2d Cir. 1975) (addition of § 7(f) "cast(s) doubt on the continued viability" of Pearlstein I); but see Stern, 603 F.2d at 1099 (Butzner, J., dissenting) (limiting § 7(f) to denying a private remedy to investors who participate knowingly in a margin violation). At minimum, the amendment substantially undercuts the reasoning of the prior decisions. Finding no significant evidence of congressional intent to imply a remedy in § 7, we hold that investors may not seek redress against a stock exchange based on its failure to enforce federal margin requirements.
 
 VI.
 
 39
 We next consider the question of whether appellant's complaint states a claim for relief under § 10(b) of the Exchange Act, 15 U.S.C. § 78j, and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.[16] Appellant alleges both that appellees committed direct violations of the Act and the Rule and that they aided and abetted the primary violations of E&H. The complaint avers that the Exchanges fraudulently induced Walck and others similarly situated to purchase and to retain Trans-Lux stock, and specifically that they "intentionally, willfully and knowingly, with scienter, withheld" certain information from the plaintiff class. The information that the Exchanges allegedly withheld includes the fact that E&H was violating certain Exchange Rules, that the concentration of Trans-Lux stock in E&H customer accounts was so large as to preclude liquidation, that acquisition of large amounts of Trans-Lux stock was not a suitable investment for these customers, that E&H had promoted Trans-Lux to its customers in order to manipulate the market, that E&H beginning in August 1973 was attempting to liquidate its under-margined accounts in a block and not individually in the best interests of the investors, and that this block constituted an overhang on the market and prevented any rise in the market price for Trans-Lux stock.
 
 
 40
 Before turning to appellant's arguments, we note a limitation on the scope of § 10(b)-Rule 10b-5 liability that appears to have escaped the attention of the parties. Appellant cannot predicate liability on any activities of E&H or of the Exchanges, no matter how fraudulent or deceptive they may have been, that induced them to "retain" Trans-Lux stock. Both the Act and the Rule authorize liability only for conduct occurring "in connection with the purchase or sale of any security." See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Walck does not allege that either E&H or the Exchanges violated § 10(b) or Rule 10b-5 in connection with any sale; his charges relate exclusively to fraudulent and deceptive inducements to purchase Trans-Lux stock and to retain it when it would have been prudent to sell. Our review on this issue therefore must be limited to consideration of appellant's allegations that the Exchanges either violated or aided and abetted E&H's violations of the statute and the rule in connection with plaintiffs' purchases of Trans-Lux stock.
 
 
 41
 Appellant's claim rests entirely on inaction and non-disclosure. He argues that the Exchanges can be held liable for violation of a "narrow duty of disclosure to public investors," and alternatively that they can be held liable as aiders and abettors even absent a duty to disclose. Appellant cites no authority for the duty to disclose. His argument in essence is that the Exchange Act is a remedial statute and should be construed flexibly, and that a narrow duty arises "from the Exchanges' duty to enforce their own rules." In our view the Act and the Rules impose no duty on exchanges to disclose member violations to interested investors, either expressly or by implication, and we think sound policy requires rejection of the duty asserted. The exchanges may have discretion to employ public disclosure as a means of enforcement, but forced disclosures could both damage other investors and hamper the exchanges' efforts to regulate and correct member violations.[17] "Flexibility in regulatory response is critical if the response is to be appropriate to the situation." Hughes v. Dempsey-Tegeler & Co., 534 F.2d 156, 169 (9th Cir.) (Renfrew, J., announcing the judgment of the court), cert. denied, 429 U.S. 896, 97 S.Ct. 259, 50 L.Ed.2d 180 (1976). The structure of the system of self-regulation simply does not comprehend or permit an inflexible duty in the regulators to bypass the regulated and report violations directly to the intended beneficiaries.
 
 
 42
 Even if the Exchanges cannot be held liable as principals for violation of a duty to disclose E&H's activities, appellant contends that they can be held liable as aiders and abettors of E&H's violations of § 10(b) and Rule 10b-5. We have recognized secondary liability for aiding and abetting a securities violation since Landy v. FDIC, 486 F.2d 139, 162-63 (3d Cir. 1973), cert. denied, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). Drawing on § 876(b) of the Restatement of Torts (1939), we held in Landy that three elements are necessary to establish liability under a theory of aiding and abetting: "(1) that an independent wrong exist; (2) that the aider or abettor know of that wrong's existence; and (3) that substantial assistance be given in effecting that wrong." The district court dismissed Walck's § 10(b)-Rule 10b-5 claim on the ground that "mere inaction or silence does not amount to 'substantial assistance' in the alleged violations." Appellant counters by quoting from Monsen v. Consolidated Dressed Beef Co., 579 F.2d 793, 800 (3d Cir.), cert. denied, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978), where we held that the "substantial assistance" element of aider and abettor liability may be satisfied by "inaction ... where the plaintiff demonstrates that the aider-abettor consciously intended to assist in the perpetration of a wrongful act."
 
 
 43
 We might agree with appellant that under the liberal "notice pleading" standards of the federal rules he has sufficiently alleged a "conscious intent" to assist E&H's violations. We are in agreement, however, with an alternative ground for affirmance suggested by counsel for appellee at oral argument. Limiting our consideration, as we must, to the fraudulent or deceptive conduct of E&H in inducing the plaintiff class to purchase Trans-Lux securities, nothing in the complaint alleges that the Exchanges knew of the wrong, as required by our formulation of the elements of aider-abettor liability in Landy. Specifically, nothing in the complaint avers that the Exchanges were privy to misleading communications between E&H and its customers. With no allegation that the Exchanges had actual knowledge of E& H's conduct in violation of § 10(b) and Rule 10b-5 leading to the plaintiffs' purchases of Trans-Lux stock,[18] the complaint fails to allege the existence of the elements necessary for relief under a theory of aiding and abetting an independent violation of the law. We therefore will affirm the dismissal of the claim brought under § 10(b) and Rule 10b-5.
 
 VII.
 
 44
 Appellant's final argument is that he has stated a claim for relief against the Exchanges for market manipulation in violation of § 9(a) of the Exchange Act, 15 U.S.C. § 78i. We do not decide whether the allegations are sufficient to state a claim under § 9, because we agree with appellees that the claim is barred by the limitation stated in § 9(e).
 
 
 45
 Section 9(e) expressly creates a private right of action for damages in favor of anyone injured by a willful violation of § 9(a), but § 9(e) also provides an express limitation on the right: "No action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation." 15 U.S.C. § 78i(e). Appellees argue that the § 9 action is barred because the complaint was filed on January 13, 1977, more than three years after the last event underlying appellant's claim, the liquidation of the E&H margin accounts on January 9, 1974.[19] We agree.
 
 
 46
 Walck argued, and the district court agreed, that the § 9(e) limitation is subject to "equitable tolling," suspending the running of the three-year limitation until the plaintiff discovered (or should have discovered) the wrong. Appellant now defends this holding on the ground that "(t)his equitable doctrine is read into every federal statute of limitation," Holmberg v. Armbrecht, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946). This broad language is, of course, dictum. The correct standard is stated in American Pipe & Construction Co. v. Utah, 414 U.S. 538, 557-58, 94 S.Ct. 756, 768, 38 L.Ed.2d 713 (1974): "whether tolling the limitation in a given context is consonant with the legislative scheme." Application of a tolling theory based on discovery of the wrong clearly would do violence to a statute containing its own limited discovery rule. The requirements that suit be brought within one year of discovery and within three years of the violation are stated in the conjunctive. Section 9(e) essentially enacts a one-year limitation, tolled until discovery, but erects a complete bar after three years. We have found no reported decisions on the point, but the limited discussion that we have found in the legislative materials supports our reading:
 
 
 47
 (T)he thought was that a man ought not to delay suit more than 1 year after he discovers the fraud. If he has been injured and finds that he has been injured, he ought to bring his action within a reasonable time, and we fix that time at 1 year. If he has not discovered it, the person who made the misrepresentation or false statement ought to feel safe at some reasonable time that he will not be disturbed.
 
 
 48
 78 Cong.Rec. 8198 (1934) (Remarks of Sen. Fletcher). We must "give effect to the statute as enacted" and "respect the compromise embodied in the words chosen by Congress. It is not our place simply to alter the balance struck by Congress in procedural statutes by favoring one side or the other in matters of statutory construction." Mohasco Corp. v. Silver, 447 U.S. 807, 819, 826, 100 S.Ct. 2486, 2493, 2497, 65 L.Ed.2d 532 (1980). Congress having specifically considered and provided for the difficulty of discovering a violation of § 9(a), we are not at liberty further to toll the statute until discovery. We therefore hold that appellant's § 9 claim is time-barred.
 
 VIII.
 
 49
 The Exchanges on cross-appeal ask us to set aside the judgment of the district court dismissing Walck's common law contract claim for want of pendent jurisdiction, and to order it dismissed for failure to state a claim on which relief can be granted.[20] Walck contends that the language of § 6(a)(1), requiring an exchange as a condition of registration to agree to enforce the Act and its regulations, creates a contract between the exchange and the Commission for the benefit of investors. We affirm the judgment of the district court. We held in Tully v. Mott Supermarkets Inc., 540 F.2d 187, 196 (3d Cir. 1976), that in the absence of "extraordinary circumstances," a district court should not exercise jurisdiction over pendent state claims if the federal claims to which they are appended are not sufficiently substantial to withstand a motion to dismiss or for summary judgment. Having affirmed the district court's disposition of each of the federal claims, and perceiving no allegation of extraordinary circumstances from either party, we find no error or abuse of discretion in the district court's decision to relegate the contract claim to a state forum.
 
 IX.
 
 50
 The judgment of the district court will be affirmed in all respects.
 
 
 
 *
 Honorable Edward D. Re, Chief Judge of the United States Court of International Trade, sitting by designation
 
 
 [1]
 Our view would have been facilitated greatly by a statement that applied appellant's numerous legal theories to specific elements of his labyrinthine factual pleading. We have not attempted to set forth a detailed narrative in this opinion, but only to indicate by general descriptions and demonstrative examples what we construe to be facts material to the various causes of action
 
 
 [2]
 The "margin" device permits a broker to extend credit to his customer to finance the customer's transactions, with the broker holding a security interest in the securities purchased as collateral for the loan. The customer pays an agreed percentage of the purchase price by depositing cash or other securities, and the broker holds the stock purchased as collateral for the balance. The broker in turn often finances the purchase by using the securities purchased as collateral for a bank loan. 2 L. Loss, Securities Regulation 1248 (2d ed. 1961). As the court explained in Bryan v. Merrill Lynch, 565 F.2d 276, 277-78 (4th Cir. 1977), an important element of the broker-customer contract
 is the promise of the customer, in the event the stock purchased declines in value, to make additional payments or to furnish other acceptable collateral in order to maintain an agreed margin of protection against loss by the broker. When a decline in value of the stock purchased reaches the point that additional payments or collateral may be required, the broker makes what is known as a "margin," or "maintenance," call on the customer. Should the customer fail to meet such call, the broker may sell the stock in the account for his protection.
 Under Federal Reserve Board Regulation T, 12 C.F.R. § 220.1 et seq., a customer purchasing stock on margin generally must advance a minimum of 50% of the purchase price in cash or in securities which at 50% of their current market value equal 50% of the purchase price. Regulation T does not specify "maintenance" margin requirements, but the Rules of the appellee Exchanges require maintenance of a margin of "25% of the market value of all securities 'long' in the account," NYSE Rule 431(b)(1); Amex Rule 462(b)(1). Most brokers by contract fix higher maintenance requirements for their own protection. For a detailed explanation of a margin transaction, see 2 Loss at 1266-67.
 
 
 [3]
 The complaint does not specify holdings before March 1, 1971, except that prior to March 1, 1970, E&H's holdings were less than 10% of issued and outstanding shares
 
 
 [4]
 Walck alleged in his complaint against E&H that he had purchased 32,300 Trans-Lux shares through E&H at prices ranging from $8.00 to $44.50, for a total cost of $384,207. On May 21, 1973, when Walck received his first margin call, Trans-Lux traded at $6.25 per share. E&H sold Walck's shares to Trans-Lux for $2.00 per share in January 1974, and the deficiency in his account after the sale was $108,631
 
 
 [5]
 We also cite and quote the unamended statute except as noted otherwise
 
 
 [6]
 Section 6, prior to 1975, stated in pertinent parts:
 (a) Any exchange may be registered with the Commission as a national securities exchange under the terms and conditions hereinafter provided in this section, by filing a registration statement in such form as the Commission may prescribe, containing the agreements, setting forth the information, and accompanied by the documents, below specified:
 (1) An agreement (which shall not be construed as a waiver of any constitutional right or any right to contest the validity of any rule or regulation) to comply, and to enforce so far as is within its powers compliance by its members, with the provisions of this title, and any amendment thereto and any rule or regulation made or to be made thereunder;
 (2) Such data as to its organization, rules of procedure, and membership, and such other information as the Commission may by rules and regulations require as being necessary or appropriate in the public interest or for the protection of investors;
 (3) Copies of its constitution, articles of incorporation with all amendments thereto, and of its existing bylaws or rules or instruments corresponding thereto, whatever the name, which are hereinafter collectively referred to as the "rules of exchange"; and
 (4) An agreement to furnish to the Commission copies of any amendments to the rules of the exchange forthwith upon their adoption.
 (b) No registration shall be granted or remain in force unless the rules of the exchange include provision for the expulsion, suspension, or disciplining of a member for conduct or proceeding inconsistent with just and equitable principles of trade, and declare that the willful violation of any provisions of this title or any rule or regulation thereunder shall be considered conduct or proceeding inconsistent with just and equitable principles of trade.
 (d) If it appears to the Commission that the exchange applying for registration is so organized as to be able to comply with the provisions of this title and the rules and regulations thereunder and that the rules of the exchange are just and adequate to insure fair dealing and to protect investors, the Commission shall cause such exchange to be registered as a national securities exchange.
 15 U.S.C. § 78f (1970). Section 6 was rewritten and considerably expanded by the Securities Acts Amendments of 1975, Pub.L.No.94-29, § 4, 89 Stat. 97, 104-09 (codified at 15 U.S.C. § 78f (1976)).
 
 
 [7]
 Similar provisions are now found in § 6(b)(1), (5), 15 U.S.C. § 78f (1976)
 
 
 [8]
 Securities Acts Amendments of 1975, Pub.L.No.94-29, § 16, 89 Stat. 97, 152-53 (codified at 15 U.S.C. § 78s(h)(1) (1976)). The 1975 amendments also created for the first time an explicit duty in the exchanges to enforce their own rules, enforceable by the SEC. Id.; see also id. § 4, 89 Stat. at 104 (amending § 6) (codified at 15 U.S.C. § 78f(b)(1) (1976)). Although we do not rest our decision on the absence of such a duty in the exchanges during the events underlying this action, the question is not free from doubt. See Senate Study at 214-15, quoted in footnote 12, infra
 
 
 [9]
 The process of legislative study and compromise leading to adoption of § 6 and its complementary provisions is detailed in Senate Study at 137-43
 
 
 [10]
 Having answered the dispositive question of congressional intent by reference to the first three factors stated in Cort v. Ash, it is unnecessary for us to consider the further inquiry of whether "the cause of action (is) one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law." 422 U.S. at 78, 95 S.Ct. at 2087. We think that in any case this factor cannot lend much weight to an inference from a federal statute, but can serve only to demonstrate that Congress has intended not to intervene by creating a federal right of action where it would be "inappropriate."
 
 
 [11]
 The court in Baird "accede(d) to the view" expressed in Judge Clark's partial dissent "that the Stock Exchange violated a duty," but it affirmed a judgment in favor of the defendant treasurer of the New York Stock Exchange on the ground that the plaintiffs had failed to prove "that the breach of duty was the cause of their loss." 141 F.2d at 239
 Appellant cites Hochfelder v. Midwest Stock Exchange, 503 F.2d 364 (7th Cir.), cert. denied, 419 U.S. 875, 95 S.Ct. 137, 42 L.Ed.2d 114 (1974), but it clearly does not support his position. The court in Hochfelder assumed for purposes of the decision that § 6 created a duty in the Exchange enforceable in a private action for damages, but it found "no proof available, to show a causal connection between plaintiffs' losses and the asserted breach of duty," 503 F.2d at 372, and therefore affirmed a summary judgment in favor of the defendant Exchange. Indeed, to the extent that Hochfelder is relevant, it tends to undercut appellant's analogy to Curran ; the Hochfelder court's reluctance to reach the question of implication demonstrates at least that the availability of a private action under § 6 was not "well understood" or "routinely and consistently ... recognized," --- U.S. at ----, 102 S.Ct. at 1839.
 
 
 [12]
 See generally H.R.Conf.Rep.229, 94th Cong., 1st Sess., reprinted in part in 1975 U.S.Code Cong. & Ad.News 179, 321; S.Rep.No.75, 94th Cong., 1st Sess., reprinted in part in 1975 U.S.Code Cong. & Ad.News 179; Senate Study; Rowen, The Securities Acts Amendments of 1975: A Legislative History, 3 Sec.Reg.L.J. 329 (1976). The minimal evidence of Congress' understanding of the "contemporary legal context" indeed tends to demonstrate that Congress believed that direct judicial review of exchange self-regulation through the mechanism of a private action under § 6 was not available. Thus the Subcommittee on Securities, in its 1973 Report to the Senate Banking Committee, stated:
 While there is no provision in the Exchange Act concerning "direct" judicial review of self-regulatory activities, many of such activities are subject to direct Commission review which in turn generates ultimate resort to the courts...
 Adequate judicial review is even less certain as to the actions of national securities exchanges. While aggrieved parties may obtain court review of the adoption of amendments to an exchange rule pursuant to a Commission request under section 19(b) of the Exchange Act, review of other exchange decisions is uncertain. There is substantial doubt that a party aggrieved by an exchange's adoption of an amendment to its rules without a Commission 19(b) request or by an exchange enforcement proceeding, can get the case into court without resort to the anti-trust laws or some other means of obtaining collateral review.
 As noted, it is not entirely clear that direct judicial review of exchange enforcement and voluntary rule-making activity is available. This is so because, unlike the provisions of the Exchange Act applicable to national securities associations, the sections governing national securities exchanges do not provide for direct Commission review of exchange initiated rule changes and exchange enforcement proceedings. It is Commission review which triggers ultimate access to the courts.
 Senate Study at 212, 214-15 (emphases in original).
 
 
 [13]
 The complaint cites NYSE Rules 405 and 431 and Amex Rules 411 and 462. Rules 405 and 411 require broker supervision of accounts, and Rules 431 and 462 regulate transactions on margin
 
 
 [14]
 Section 7 authorizes the Federal Reserve Board to regulate margin transactions and forbids violations of the Board's regulations. Regulation T, promulgated under authority of § 7, generally sets the margin rate for securities purchases at 50%, meaning that a purchaser generally must advance half of the purchase price of securities acquired "on margin." See note 1, supra. The margin rate historically has varied from 40% to 100%. When the Federal Reserve Board determines that stock market activity and prices are unduly stimulated by easy credit, it raises margin requirements and thus reduces the amount of credit available for the purchase of securities. When the Board wants to stimulate the market as part of its overall monetary policy, it reduces margin requirements. See J. Weston & E. Weston, Managerial Finance 395 (5th ed. 1975)
 
 
 [15]
 See p. 783, supra
 
 
 [16]
 Appellant also contends that he has an implied right of action under § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77o. We do not reach this question. Section 17(a) is substantively identical to Rule 10b-5 and the same facts are pleaded as a violation. Addition of a § 17(a) remedy would add nothing to Walck's 10b-5 claim, so we need not decide the issue of implication in this case
 
 
 [17]
 We are concerned also that a private disclosure to affected investors, which apparently is contemplated by appellant's argument, might itself be considered a violation of Rule 10b-5. See, e.g., Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 495 F.2d 228 (2d Cir. 1974)
 
 
 [18]
 We suggested in Gould v. American-Hawaiian Steamship Co., 535 F.2d 761, 780 (3d Cir. 1976), that "(t)he requirement of knowledge may be less strict" than actual knowledge of the wrong "where the alleged aider and abettor derives benefits from the wrongdoing." This dictum is of no significance here, however, because the complaint does not allege that the Exchanges benefitted from E&H's wrong. This factor provides a sharp distinction between this case and Monsen, however, where we permitted liability based on silence and inaction consciously intended to assist the wrongdoing, because there the aider and abettor was a secured lender with actual knowledge of the wrong who benefitted on liquidation from the increase in its borrower's assets resulting from a number of wrongfully procured unsecured loans. In Monsen, but not here, the defendant aider and abettor was the actual beneficiary of non-disclosure to the defrauded plaintiffs
 
 
 [19]
 The complaint alleges generally that E&H sold a block of 146,300 shares of Trans-Lux stock on January 14, 1974, a date within the limitations period, but it does not allege that appellant's shares were among this block. We need not decide whether this allegation was sufficient to state a claim, however, because the argument as to limitations was presented to the district court by way of a motion for summary judgment, relying on appellant's admission in the course of discovery that his account was liquidated on January 9, 1974. Appellant has not repudiated this admission either in the proceedings below or on appeal. We conclude, therefore, that there is no genuine issue as to this very important material fact. See Rule 56(c), (e), F.R.Civ.P
 
 
 [20]
 The parties do not contest that this claim is governed by state law