NASDAQ OMX PHLX, INC., Appellee

v.

PENNMONT SECURITIES and Joseph
D. Carapico, Appellants.

Superior Court of Pennsylvania.

Argued Nov. 15, 2011.
Filed July 16, 2012.
Reargument Denied Sept. 19, 2012.

Lynanne B. Westcott, Philadelphia, for appellants.

Stephen J. Kastenberg, Philadelphia, for appellee.

BEFORE: BENDER, MUNDY and FITZGERALD*, JJ.

OPINION BY FITZGERALD, J.: *

Appellants, PennMont Securities ("PennMont") and Joseph D. Carapico, appeal from the order entered by the Philadelphia Court of Common Pleas granting summary judgment in favor of Appellee, NASDAQ OMX PHLX, Inc. ("Exchange"). We hold that the Exchange had no authority to initiate a private right of action to collect disciplinary fines imposed by Exchange Rule 651, a rule enacted by the Exchange pursuant to the federal Securities Exchange Act of 1934[1] ("Exchange Act"). We further hold that even if the Exchange had such authority, and the Exchange had properly pleaded the cause of action as one for breach of contract, the courts of this Commonwealth do not have subject matter jurisdiction. Accordingly, we vacate the order appealed from and remand with instructions to dismiss the lawsuit.

We state the facts as set forth by the United States Court of Appeals for the Third Circuit:

The ... Exchange is a registered national securities exchange. As a registered exchange, it is deemed a self-regulatory organization [ ("SRO") ] by the

* Former Justice specially assigned to the Superior Court.

1. 15 U.S.C. §§ 78a–78pp (2012).

[Exchange Act]. *See* 15 U.S.C. § 78c(a)(26). Like all similar entities, the Exchange "has a duty to promulgate and enforce rules governing the conduct of its members." *See Barbara v. N.Y. Stock Exch., Inc.,* 99 F.3d 49, 51 (2d Cir.1996).

In 1998, the Exchange entered into negotiations to sell its assets to the American Stock Exchange ("AMEX"). This sale would have generated more than $100 million for the Exchange, but also would have divested Exchange members of certain governance and equity trading privileges. *Penn Mont Sec. v. Frucher,* 534 F.Supp.2d 538, 539 (E.D.Pa.2008). PennMont, a member of the Exchange, vehemently objected to the sale, arguing that it would have drastically devalued PennMont's ownership stake in the Exchange. PennMont subsequently brought an action against the Exchange, seeking to enjoin the sale. Although the trial court denied Penn-Mont's injunction, the sale to AMEX fell through while the case was pending.

Several years later, the Exchange's leadership again earned the ire of Penn-Mont. In 2003, the Exchange attempted to alter its corporate structure by converting the Exchange from a non-stock company, with ownership interest measured by seats on the Exchange, to a stock corporation, with ownership interests measured by shares. As with the proposed sale to AMEX, this planned restructuring would have diminished the value of PennMont's ownership stake in the Exchange. PennMont amended its complaint in the previous action to challenge this "demutualization." Again, the trial court denied the injunction. The [Exchange and the other defendants PennMont sued] subsequently moved for summary judgment, which was ultimately granted by the trial court.

In August 2004, shortly before the trial court ruled on the summary judgment motion, the Exchange passed a fee-shifting provision pursuant to its rule-making authority. The provision in question—Rule 651—states that

[a]ny member, member organization, foreign currency options participant, foreign currency options participant organization, or person associated with any of the foregoing who fails to prevail in a lawsuit or other legal proceeding instituted by such person or entity against [the Exchange] or any of its board members, officers, committee members, employees, or agents, and related to the business of [the Exchange], shall pay to [the Exchange] all reasonable expenses, including attorneys' fees, incurred by [the Exchange] in the defense of such proceeding, but only in the event that such expenses exceed $50,000. This provision shall not apply to disciplinary actions by [the Exchange], to administrative appeals of [the Exchange] actions or in any specific instances where the Board has granted a waiver of this provision.

*Self–Regulatory Organizations; Philadelphia Stock Exchange, Inc.; Notice of Filing and Immediate Effectiveness of Proposed Rule Change Relating to Legal Fees Incurred by the Exchange,* S.E.C. Rel. No. 34–50159, 2004 WL 2049378, at *1 (Aug. 5, 2004). This rule, in sum, would require a member of the Exchange to reimburse the Exchange for its legal fees if the member failed to prevail in a lawsuit it initiated against the Exchange, and the Exchange spent more than $50,000 defending itself.

Approximately one month after the Exchange instituted Rule 651, the Exchange won its summary judgment motion against PennMont. The decision

was affirmed by the Pennsylvania Superior Court in 2006.

In November 2007, more than a year and a half after the Superior Court affirmed the grant of summary judgment, the Exchange invoked Rule 651 and billed PennMont $925,612 for legal fees incurred in defending the lawsuit. This bill included fees incurred well prior to passage of Rule 651. The Exchange stated that it would debit the amount from PennMont's clearing account if PennMont refused to pay. PennMont objected to the invoice and then moved for a [temporary restraining order ("TRO") ] and preliminary injunction enjoining the collection of attorneys' fees.

While the District Court considered PennMont's motion, the Exchange's Special Committee to Review Delinquencies and Payments ("Special Committee") reviewed PennMont's objections to the invoice. The Special Committee conducted a telephone hearing that was presided over by three Exchange board members, one of whom was a named party in the 1998 lawsuit. PennMont did not participate in this hearing. Approximately two weeks after the hearing, the Special Committee issued an order and opinion upholding the imposition of attorneys' fees.[2] The Exchange assured the District Court, however, that it would not attempt to collect the funds until the District Court ruled on PennMont's TRO and preliminary injunction.

On February 12, 2008, the District Court denied PennMont's motion for a TRO and preliminary injunction and also dismissed the case for failure to state a claim. Specifically, the District Court noted that: (1) courts have upheld fee shifting provisions mirroring those in Rule 651 time and time again as consistent with the Exchange Act; (2) the Securities and Exchange Commission ("SEC") declared Rule 651 "effective upon filing" and has not attempted to amend or abrogate the rule since; and (3) the Exchange's decision to apply or not apply an internal rule governing the conduct of its members constitutes an exercise of delegated regulatory power and therefore cannot serve as the basis for a private civil suit in a district court. Accordingly, the District Court held that the Exchange had absolute immunity from suit and thus PennMont could not show a likelihood of success on the merits, nor state a claim upon which relief could be granted. The District Court noted, however, that PennMont was not completely without remedies—it could appeal the Special Committee's decision to the SEC, and thereafter appeal the SEC's decision to the Court of Appeals.

*PennMont Sec. v. Frucher*, 586 F.3d 242, 243–45 (3d Cir.2009) [hereinafter *Frucher* ] (footnotes omitted), *cert. denied*, —— U.S. ——, 130 S.Ct. 1698, 176 L.Ed.2d 182 (2010).

With respect to Rule 651, the *Frucher* Court observed:

As pointed out by the District Court, regulations similar to Rule 651 have been consistently approved by the SEC. *See, e.g., Order Granting Approval to Proposed Rule Change by the Pacific Stock Exchange, Inc., Relating to the Liability of the Exchange and its Governors, Officers and Agents*, S.E.C. Release No. 37563, 62 S.E.C. Docket 1527, 1996 WL 466637 (Aug. 14, 1996) ("Pacific Stock Exchange Rule"). The Pacific Stock Exchange Rule—which contains an attorney fee provision largely identical to Rule 651—applies to "a member or associated person who fails to prevail

---

2. PennMont did not appeal the determination of the Special Committee.

in a lawsuit or other legal proceeding instituted by that person against the Exchange or other specified persons, and related to the business of the Exchange...." *Id.* The SEC found that this rule was consistent with the Pacific Stock Exchange's mandate under the Exchange Act to craft rules "provid[ing] for the equitable allocation of reasonable dues, fees, and other charges among its members...." *Id.* (citing 15 U.S.C. § 78f(b)(4)).

*Id.* at 246–47.

PennMont appealed from the District Court's order. On August 17, 2009, the Third Circuit "dismiss[ed] this appeal for lack of subject matter jurisdiction and remand[ed] to the District Court with instructions to vacate its order and to dismiss this action for lack of subject matter jurisdiction." *Id.* at 247. The District Court dismissed the case on October 6, 2009. Order, 10/6/09. PennMont subsequently exhausted all administrative remedies contesting the imposition of fees. *See PennMont Sec. v. SEC,* 414 Fed.Appx. 465 (3d Cir.2011).

Meanwhile, on March 10, 2008, the Exchange suspended the membership of PennMont and Carapico, a general partner of PennMont. *In re PennMont Sec.,* Exchange Act Release No. 61967, 98 SEC Docket 1255, 2010 WL 1638720 (Apr. 23, 2010) (appl. for review of disciplinary action taken by Exchange); Pl.'s Compl. at ¶ 4. On April 4, 2008, while PennMont's appeal was pending before the Third Circuit, the Exchange sued Appellants for breach of contract in the Philadelphia County Court of Common Pleas. The Exchange claimed Appellants were required to comply with Rule 651. *See* Pl.'s Compl. at ¶ 4. The Exchange averred it sent an invoice to Appellants for $925,612.20, but later reduced the amount owed to $913,963.38. *See id.* at ¶ 10. Appellants failed to pay, the Exchange claimed, and thus owed $913,963.38, plus interest, under Rule 651. *See id.* at 5.[3] Specifically, the Exchange alleged that Appellants' "failure and refusal to pay the amounts validly due and owing under the Invoice as adjusted plus interest constitutes a breach of contract that has injured [the Exchange] and remains uncured as of the date of this Complaint." *Id.* at ¶ 15.

The Exchange filed a motion for summary judgment, insisting that "Rule 651 does not provide [it] with a cause of action that it could have asserted in a lawsuit. A claim under Rule 651 is properly an administrative SRO matter, not one for the courts." Mem. of Law in Supp. of Pl.'s Mot. for Summ. J., 5/18/09, at 18. Appellants opposed, arguing, *inter alia,* lack of subject matter jurisdiction and that an invoice does not establish the existence of a contract. Defs.' Resp. in Opp. to Pl.'s Mot. for Summ. J., 6/17/09, at 15. The court granted the Exchange's motion for summary judgment on October 5, 2009.

Appellants timely filed a notice of appeal on November 4, 2009. The court did not order a Pa.R.A.P. 1925(b) statement, but filed a Pa.R.A.P. 1925(a) opinion on November 23, 2009. The trial court summarily resolved, in two paragraphs, Appellant's challenge to subject matter jurisdiction.

Appellants raise the following issues:

Did the Court of Common Pleas have jurisdiction to hear this matter, termed a contract action when filed by [the Exchange], when the only remedy requested was one not provided for under the Exchange Act, the rules and regulations promulgated thereunder, or the [Ex-

---

**3.** The *ad damnum* clause is on page five of the complaint.

change's] own Charter, By–Laws and Rules?

Did [the Exchange] procedurally meet the requirements to legally enter the case and prosecute the action?

Was there any evidence of record that [the Exchange] had a contract with [Appellants] that gave it a legal right to proceed with the contract case?

If the trial court had jurisdiction, and [the Exchange] properly procedurally entered the case and was legally entitled to proceed with the case, did the trial court err in granting summary judgment to [the Exchange] on its state contract claim when there were material facts in dispute?

Appellant's Brief at 2.

For their first issue, Appellants claim that federal courts have exclusive subject matter jurisdiction for "all suits in equity and actions at law brought to enforce any liability or duty created by [the Securities Exchange Act] or the rules and regulations thereunder." Appellant's Brief at 9 (alteration in original) (quoting 15 U.S.C. § 78aa). Because Rule 651 is a rule enacted under the Exchange Act, Appellants contend, the courts of this Commonwealth lack jurisdiction. Appellants allege that Rule 651 provides no remedy other than suspension from the Exchange.

The Exchange counters that federal courts have exclusive jurisdiction of violations of the Exchange Act "or the rules and regulations thereunder." Exchange's Brief at 19 (quoting 15 U.S.C. § 78aa). The Exchange suggests that the phrase "rules and regulations" excludes "rules of securities exchanges, such as Rule 651." *Id.* Citing *Ford v. Hamilton Investments, Inc.,* 29 F.3d 255 (6th Cir.1994), and *Barbara v. New York Stock Exchange, Inc.,* 99 F.3d 49 (2d Cir.1996), the Exchange claims

that courts "routinely rely" on that interpretation to hold that federal courts lack exclusive jurisdiction over common law claims. *Id.* at 20. The Exchange insists that it "did not sue PennMont for a violation of the Exchange Act or any federal rule or regulation thereunder. Rather, [the Exchange] filed a simple state law breach of contract claim for non-payment of an invoice." *Id.* at 21.

The trial court addressed jurisdiction as follows:

PennMont argues that only federal courts have subject matter jurisdiction over controversies involving the Securities and Exchange Act of 1934. However, as the Third Circuit said in this very dispute, federal jurisdiction is triggered only after exhaustion of the administrative remedies provided by the Securities and Exchange Act. PennMont failed to exhaust the administrative remedies provided by the Act, the time to pursue such remedies elapsed, and the federal courts have no subject matter jurisdiction.

The Court of Common Pleas has unlimited original jurisdiction of all actions and proceedings cognizable by law or usage in the courts of common pleas. The courts of common pleas have jurisdiction to hear and decide controversies involving the rights and obligations of any parties, unless jurisdiction has been specifically removed by statute or rule of law. In this case, the Court has unlimited original jurisdiction, and the complaint asserts a straightforward collection claim cognizable in the Courts of Common Pleas of Pennsylvania. There is no statute or rule of law specifically removing jurisdiction.

Trial Ct. Op., 11/30/09, at 5–6.[4] We hold Appellants are entitled to relief.

---

4. The trial court's opinion was not paginated.

■ As a prefatory matter, we acknowledge

> that federal court decisions do not control the determinations of the Superior Court. Our law clearly states that, absent a United States Supreme Court pronouncement, the decisions of federal courts are not binding on Pennsylvania state courts, even when a federal question is involved. When the Third Circuit has spoken on a federal issue, the ultimate answer to which has not yet been provided by the United States Supreme Court, it is appropriate for this Court to follow Third Circuit precedent in preference to that of other jurisdictions. Whenever possible, Pennsylvania state courts follow the Third Circuit so that litigants do not improperly "walk across the street" to achieve a different result in federal court than would be obtained in state court. Thus, if the Third Circuit has not ruled on a specific question, this Court may seek guidance from the pronouncements of the other federal circuits, as well as the district courts, in the same spirit in which the Third Circuit itself considers such decisions. Furthermore, if there is a circuit split and the pronouncements of the Third Circuit are "clearly wrong" in light of the decisions of other circuits, Pennsylvania appellate courts need not follow the Third Circuit's decisions.

*Werner v. Plater–Zyberk,* 799 A.2d 776, 782 (Pa.Super.2002) (citations omitted); *accord Graziani v. Randolph,* 856 A.2d 1212, 1218 (Pa.Super.2004).

The standard of review of a summary judgment ruling is well established:

> We view the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genu-ine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered. Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.

*Daley v. A.W. Chesterton, Inc.,* —— Pa. ——, ——, 37 A.3d 1175, 1179 (2012).

We frame Appellants' first issue as follows: whether courts of this Commonwealth have jurisdiction to entertain the Exchange's breach of contract claim, which alleges Appellants failed to comply with Rule 651, a rule enacted by an SRO pursuant to the Exchange Act. *See* Pl.'s Compl. at ¶¶ 4, 15. In resolving this issue, we first inquire whether the Exchange has the authority to bring a private right of action [5] to enforce the imposition of disciplinary fines. Assuming the Exchange does have authority and assuming that the private right of action is correctly defined as one for breach of contract, we ascertain whether the Exchange may initiate a private right of action for breach of contract in the courts of this Commonwealth.

■ In *Dooner v. DiDonato,* 601 Pa. 209, 971 A.2d 1187 (2009), the Pennsylvania Supreme Court discussed the purposes and objectives of the Exchange Act:

> The congressional purpose in enacting the Securities Exchange Act was to protect interstate commerce, the public, and investors by prohibiting the manipu-

---

**5.** We employ the phrase "private right of action" and "private cause of action" inter-changeably.

lation of stock prices and stock transactions, and to insure the maintenance of fair and honest markets in such transactions. In furtherance of these purposes, Congress created two distinct aspects of federal regulation. Some provisions of the statute directly impose requirements and prohibitions, while other provisions rely upon exchange self-regulation.... Exchanges are registered with the [Securities and Exchange Commission ("SEC") ]. Registration is conditioned upon a showing that exchanges have rules that are designed "to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, ... and, in general, to protect investors and the public interest."

Thus, it becomes evident that the driving principle behind the regulatory scheme of self-regulation and, more specifically, national securities exchange rules concerning the disciplining of traders is "to insure fair dealing and to protect investors from harmful or unfair trading practices." [A]ny exchange rule or practice in contravention of this policy would be subject to federal supervision or action, but, "[c]orrespondingly, any rule or practice not germane to fair dealing or investor protection would not appear to fall under the shadow of the federal umbrella; it is, instead, subject to applicable state law."

*Id.* at 227–28, 971 A.2d at 1198–99 (citations and footnote omitted). In sum, "disciplinary rules regarding trader conduct" enacted pursuant to the Exchange Act have two core purposes: "fair dealing and investor protection." *Id.* at 230, 971 A.2d at 1200; *see also id.* at 232, 971 A.2d at 1201 (stating, "an exchange's disciplinary rules deal principally with the just and equitable principles of trading"). Indeed, the SEC cannot approve a rule unless it is consistent with, and furthers the objectives

of, the Exchange Act. *Shearson/Am. Express, Inc. v. McMahon,* 482 U.S. 220, 233, 107 S.Ct. 2332, 2341, 96 L.Ed.2d 185, 198 (1987).

We discuss the evolving standards for identifying the existence of a private right of action. "In 1975[,] the Court unanimously decided to modify its approach to the question whether a federal statute includes a private right of action." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 377, 102 S.Ct. 1825, 1838, 72 L.Ed.2d 182, 200 (1982) (footnote omitted) (referencing *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975)). The *Cort* Court opined:

In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff one of the class for whose **especial** benefit the statute was enacted—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Cort,* 422 U.S. at 78, 95 S.Ct. at 2088, 45 L.Ed.2d at 36 (quotations and citations omitted). The *Cort* Court elaborated that "in situations in which it is clear that federal law has granted a class of persons certain rights, it is not necessary to show an intention to create a private cause of action, although an explicit purpose to deny such cause of action would be controlling." *Id.* at 82, 95 S.Ct. at 2090, 45 L.Ed.2d at 39 (footnote omitted).

Subsequently, however, the United States Supreme Court eroded the *Cort* framework and narrowed the court's inquiry in *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). The *Redington* Court explained that the *Cort* factors are used only to discern legislative intent:

> But the [*Cort* ] Court did not decide that each of these factors is entitled to equal weight. The central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action. Indeed, the first three factors discussed in *Cort*—the language and focus of the statute, its legislative history, and its purpose—are ones traditionally relied upon in determining legislative intent.

*Id.* at 575–76, 99 S.Ct. at 2489, 61 L.Ed.2d at 96 (citation omitted).[6]

The *Redington* Court applied the above framework in interpreting 15 U.S.C. § 78q(a) of the Exchange Act. At that time, Section 78q(a) stated:

> "Every national securities exchange, every member thereof, ... and every broker or dealer registered pursuant to ... this title, shall make, keep, and preserve for such periods, such accounts, correspondence, ... and other records, and make such reports, as the [Securities and Exchange] Commission by its rules and regulations may prescribe as necessary or appropriate in the public interest or for the

protection of investors." 15 U.S.C. § 78q(a) (1970 ed.).

In terms, § 17(a) [*i.e.,* § 78q(a) ] simply requires broker-dealers and others to keep such records and file such reports as the Commission may prescribe.

*Redington,* 442 U.S. at 568–69, 99 S.Ct. at 2485, 61 L.Ed.2d at 91. The high court considered whether this statute implied a cause of action for damages "against accountants who audit such reports, based on misstatements contained in the reports." *Id.* at 562, 99 S.Ct. at 2482, 61 L.Ed.2d at 87 (footnote omitted).

> The *Redington* Court held that § 17(a) does not, by its terms, purport to create a private cause of action in favor of anyone. It is true that in the past our cases have held that in certain circumstances a private right of action may be implied in a statute not expressly providing one. But in those cases finding such implied private remedies, the statute in question at least prohibited certain conduct or created federal rights in favor of private parties. By contrast, § 17(a) neither confers rights on private parties nor proscribes any conduct as unlawful.
>
> The intent of § 17(a) is evident from its face. Section 17(a) is like provisions in countless other statutes that simply require certain regulated businesses to keep records and file periodic reports to enable the relevant governmental authorities to perform their regulatory functions.... But § 17(a) does not by

---

**6.** The *Redington* Court observed that "in a series of cases since [*J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964),] we have adhered to a stricter standard for the implication of private causes of action, and we follow that stricter standard today." *Redington,* 442 U.S. at 578, 99 S.Ct. at 2490, 61 L.Ed.2d at 97; *accord Corr. Servs. Corp. v. Malesko,* 534 U.S. 61, 67 n. 3, 122 S.Ct. 515, 519 n. 3, 151 L.Ed.2d 456, 463 n. 3

(2001) (stating, "Since our decision in *Borak,* we have retreated from our previous willingness to imply a cause of action where Congress has not provided one." (citations omitted)). The *Redington* decision also postdates *Colonial Realty Corp. v. Bache & Co.,* 358 F.2d 178 (2d Cir.1966), which set forth a less restrictive framework for determining the existence of a private right of action.

any stretch of its language purport to confer private damages rights or, indeed, any remedy in the event the regulatory authorities are unsuccessful in achieving their objectives.... In short, there is no basis in the language of § 17(a) for inferring that a civil cause of action for damages lay in favor of anyone.

As the Court of Appeals recognized, the legislative history of the 1934 Act is entirely silent on the question whether a private right of action for damages should or should not be available under § 17(a) in the circumstances of this case. [The appellants] nevertheless argue that because Congress did not express an intent to deny a private cause of action under § 17(a), this Court should infer one. But implying a private right of action on the basis of congressional silence is a hazardous enterprise, at best. And where, as here, the plain language of the provision weighs against implication of a private remedy, the fact that there is no suggestion whatsoever in the legislative history that § 17(a) may give rise to suits for damages reinforces our decision not to find such a right of action implicit within the section.

Further justification for our decision not to imply the private remedy that [Appellants] seek to establish may be found in the statutory scheme of which § 17(a) is a part. First, § 17(a) is flanked by provisions of the 1934 Act that explicitly grant private causes of action.... Obviously, then, when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly.

*Id.* at 569–572, 99 S.Ct. at 2485–87, 61 L.Ed.2d at 91–93 (footnotes and citations omitted). In sum, the *Redington* Court examined the statutory language and refused to infer a private right of action

based on congressional silence, particularly when Congress explicitly set forth private rights of action in other sections of the Exchange Act. *See id.*

The *Redington* appellants, however, relying on *Cort*, asked the high court to "consider whether an implied private remedy is necessary to 'effectuate the purpose of the section' and whether the cause of action is one traditionally relegated to state law." *Id.* at 575, 99 S.Ct. at 2489, 61 L.Ed.2d at 95. The *Redington* Court refused, reasoning "such inquiries have little relevance to the decision of this case" because

> the statute by its terms grants no private rights to any identifiable class and proscribes no conduct as unlawful. And the parties as well as the Court of Appeals agree that the legislative history of the 1934 Act simply does not speak to the issue of private remedies under § 17(a). At least in such a case as this, the inquiry ends there: The question whether Congress, either expressly or by implication, intended to create a private right of action, has been definitely answered in the negative.

*Id.* at 576, S.Ct. at 2489, 61 L.Ed.2d at 96. Thus, the *Redington* Court limited the *Cort* framework: "our task is limited *solely* to determining whether Congress intended to create the private right of action...." *Id.* at 568, 99 S.Ct. at 2485, 61 L.Ed.2d at 91 (emphasis added).

More importantly, despite the absence of an express right of action, the *Redington* Court explicitly refused to examine whether an implied private remedy would effectuate the purpose of the Exchange Act. *See id.* at 576, 99 S.Ct. at 2489, 61 L.Ed.2d at 96. The high court also declined to determine whether the cause of action was "traditionally relegated to state law." *See id.* at 575, 99 S.Ct. at 2489, 61 L.Ed.2d at 95. The Supreme Court con-

cluded, "nothing ... prevents Congress from creating a private right of action ... for losses arising from misstatements contained in § 17(a) reports. But if Congress intends [for] such a federal right of action, it is well aware of how it may effectuate that intent." *Id.* at 579, 99 S.Ct. at 2491, 61 L.Ed.2d at 98.

The trend continued in *Thompson v. Thompson,* 484 U.S. 174, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988), in which the high court held that it was not limited to the *Cort* factors in ascertaining Congress's intent:

> In determining whether to infer a private cause of action from a federal statute, our focal point is Congress'[s] intent in enacting the statute. As guides to discerning that intent, we have relied on the four factors set out in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975), **along with other tools** of statutory construction.

*Id.* at 179, 108 S.Ct. at 516, 98 L.Ed.2d at 519–20 (emphasis added). In a concurring opinion, Justice Scalia insisted that "[i]t could not be plainer that we effectively overruled the *Cort v. Ash* analysis ... converting one of its four factors (congressional intent) into **the determinative factor,** with the other three merely indicative of its presence or absence." *Id.* at 189, 108 S.Ct. at 521, 98 L.Ed.2d at 526 (citing *Redington* and *Transamerica Mortg. Advisors, Inc. v. Lewis,* 444 U.S. 11, 18, 100 S.Ct. 242, 246, 62 L.Ed.2d 146, 153–54 (1979)) (Scalia, J., concurring).

In *Alexander v. Sandoval,* 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), the high court continued to dismantle the *Cort* framework. The *Sandoval* Court examined whether there was a private right of action to enforce a federal regulation promulgated pursuant to federal law. *Id.* at 279, 121 S.Ct. at 1515, 149 L.Ed.2d at 523. The federal law in question, known as Section 601 of Title VI of the Civil Rights Act of 1964, provides that no person "shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. "Section 602 authorizes federal agencies 'to effectuate the provisions of [§ 601] ... by issuing rules, regulations, or orders of general applicability....'" *Sandoval,* 532 U.S. at 278, 121 S.Ct. at 1515, 149 L.Ed.2d at 523 (quoting 42 U.S.C. § 2000d–1) (first alteration in original). Consistent with this statute, the United States Department of Justice ("DOJ") enacted a regulation "forbidding funding recipients to 'utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin....'" *Id.* (quoting 28 C.F.R. § 42.104(b)(2) (2000)).

The Alabama Department of Public Safety ("Department") received funding from the DOJ and thus was subject to that regulation. *Id.*

> The State of Alabama amended its Constitution in 1990 to declare English "the official language of the state of Alabama." Amdt. 509. Pursuant to this provision and, petitioners have argued, to advance public safety, the Department decided to administer state driver's license examinations only in English. Respondent Sandoval, as representative of a class, brought suit in the United States District Court for the Middle District of Alabama to enjoin the English-only policy, arguing that it violated the DOJ regulation because it had the effect of subjecting non-English speakers to discrimination based on their national origin.

*Id.* at 278–79, 121 S.Ct. at 1515, 149 L.Ed.2d at 523.

In examining the issue, the high court made several assumptions. One of the assumptions was that a regulation promulgated under Section 602 "may validly proscribe activities that have a disparate impact on racial groups, even though such activities are permissible under § 601." *Id.* at 281, 121 S.Ct. at 1517, 149 L.Ed.2d at 525. Based on, *inter alia*, that assumption, the *Sandoval* Court opined:

> It is clear now that the disparate-impact regulations do not simply apply § 601—since they indeed forbid conduct that § 601 permits—and therefore clear that the private right of action to enforce § 601 does not include a private right to enforce these regulations. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 173, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (a "private plaintiff may not bring a [suit based on a regulation] against a defendant for acts not prohibited by the text of [the statute]"). That right must come, if at all, from the independent force of § 602. As stated earlier, we assume for purposes of this decision that § 602 confers the authority to promulgate disparate-impact regulations; the question remains whether it confers a private right of action to enforce them.

*Id.* at 285–86, 121 S.Ct. at 1519, 149 L.Ed.2d at 528 (footnote omitted). "Language in a regulation may invoke a private right of action that Congress through statutory text created," the *Sandoval* Court observed, "but [such language] may not create a right that Congress has not." *Id.* at 291, 121 S.Ct. at 1522, 149 L.Ed.2d at 531.

■ The high court then summarized the concept of a private right of action:

> [P]rivate rights of action to enforce federal law must be created by Congress. The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy. Statutory intent on this latter point is determinative. Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.

*Id.* at 286–87, 121 S.Ct. at 1519–20, 149 L.Ed.2d at 528 (citations omitted); *accord Susquehanna Area Reg'l Airport Auth. v. Middletown Area Sch. Dist.*, 918 A.2d 813, 816 (Pa.Cmwlth.2007).[7] "Put succinctly, for an implied right of action to exist, a statute must manifest Congress's intent to create (1) a personal right, and (2) a private remedy." *Three Rivers Ctr. for Indep. Living v. Hous. Auth. of the City of Pittsburgh*, 382 F.3d 412, 421 (3d Cir. 2004).

The *Sandoval* Court emphatically rejected the notion that courts have the obligation " 'to provide such remedies as are necessary to make effective the congressional purpose' expressed by a statute.' " *Sandoval*, 532 U.S. at 287, 121 S.Ct. at 1520, 149 L.Ed.2d at 529 (citation omitted). The high court also refused to give " 'dispositive weight' to the 'expectations' that the enacting Congress had formed 'in light of the 'contemporary legal context.' " *Id.* at 287–88, 121 S.Ct. at 1520, 149 L.Ed.2d at 529 (citation omitted). The *Sandoval* Court explained that consideration of Congress's expectations independent of the statutory text was improper and that "legal context matters only to the extent it clarifies text." *Id.* at 288, 121 S.Ct. at 1520, 149 L.Ed.2d at 529.

7. Although decisions of the Commonwealth Court are not binding on this Court, we may rely on them if we are persuaded by their reasoning. *In re Brown*, 30 A.3d 1200, 1204 n. 2 (Pa.Super.2011).

Applying these precepts, the *Sandoval* Court discerned Congress's intent from the statutory text of § 602. *See id.* The high court concluded that unlike § 601, which expressly decreed new rights, § 602 focuses on effectuating rights created by § 601. *See id.* at 289, 121 S.Ct. at 1521, 149 L.Ed.2d at 530. The Court continued:

> And the focus of § 602 is twice removed from the individuals who will ultimately benefit from Title VI's protection. Statutes that focus on the person regulated rather than the individuals protected create "no implication of an intent to confer rights on a particular class of persons." Section 602 is yet a step further removed: It focuses neither on the individuals protected nor even on the funding recipients being regulated, but on the agencies that will do the regulating. Like the statute found not to create a right of action in *Universities Research Assn., Inc. v. Coutu*, 450 U.S. 754, 101 S.Ct. 1451, 67 L.Ed.2d 662 (1981), § 602 is "phrased as a directive to federal agencies engaged in the distribution of public funds," *id.*, at 772, 101 S.Ct. 1451. When this is true, "[t]here [is] far less reason to infer a private remedy in favor of individual persons," *Cannon v. University of Chicago, supra* [441 U.S. 677], at 690–691, 99 S.Ct. 1946 [60 L.Ed.2d 560 (1979)]. So far as we can tell, this authorizing portion of § 602 reveals no congressional intent to create a private right of action.

*Id.* at 289, 121 S.Ct. at 1521, 149 L.Ed.2d at 530 (citation omitted).

 Based upon our interpretation of post-*Cort* caselaw, we arrive at three conclusions, although we caution that they should not be read in the abstract or in isolation and construed as altering the well-settled framework for interpreting federal statutes. First, courts must examine the statutory text in discerning Con-

gress's intent to provide a private right of action in a federal statute. *See, e.g., Sandoval*, 532 U.S. at 288, 121 S.Ct. at 1520, 149 L.Ed.2d at 529. As the *Sandoval* Court observed, "legal context matters only to the extent it clarifies text." *Id.* Second, if the statutory text does not create a private right of action, the legislative history for that statutory text is silent regarding the existence of a private right of action, and other parts of the statute explicitly provide for private rights of action, then courts will generally not imply "a private right of action on the basis of congressional silence." *Redington*, 442 U.S. at 571, 99 S.Ct. at 2486, 61 L.Ed.2d at 93. The rationale is that "when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly." *Id.* at 572, 99 S.Ct. at 2487, 61 L.Ed.2d at 93. Third, if a regulation prohibits acts not barred by the statute, then courts examine whether the statute authorizing such regulation also confers a private right of action to enforce that regulation. *See Sandoval*, 532 U.S. at 285–86, 121 S.Ct. at 1519, 149 L.Ed.2d at 528 (assuming that § 602 "confers authority to promulgate disparate-impact regulations; [thus,] question remains whether it confers a private right of action to enforce them."). Conversely, if a regulation forbids acts barred by statute, then the statute may include a private right of action to enforce that regulation. *Cf. id.* at 285, 121 S.Ct. at 1519, 149 L.Ed.2d at 528 (suggesting that because regulations enacted pursuant to § 602 prohibits acts permitted by § 601, private right of action to enforce § 601 cannot include private right of action to enforce § 602 regulations).

The post-*Cort* framework is exemplified in *Fiero v. Financial Industry Regulatory Authority, Inc.*, 660 F.3d 569 (2d Cir.2011) [hereinafter *Fiero I*]. In *Fiero I*, the Second Circuit examined whether the Financial Industry Regulatory Authority ("FIN-

RA"), an SRO, had "the authority to bring court actions to collect disciplinary fines it has imposed." *Id.* at 571. FINRA is "responsible for regulatory oversight of all securities firms that do business with the public," and "has the power to initiate a disciplinary proceeding against any FINRA member . . . for violating any FINRA rule. . . ." *Id.* at 571, 572 (citing 15 U.S.C. § 78s(b), 78s(h)(3)). The Fiero Brothers, Inc. was a member of FINRA, and John J. Fiero was the sole representative of Fiero Brothers (collectively, "Fieros"). *Id.* at 572. The Fieros were subject to the regulations of FINRA. *Id.* In 1998, FINRA's predecessor, the National Association of Securities Dealers ("NASD"), fined the Fieros $1,000,000 for violating various provisions of the Exchange Act and FINRA rules. *Id.*

The Fieros refused to pay, and FINRA filed suit in New York state court seeking to collect the fines. *Id.* The New York trial court held in favor of FINRA, reasoning:

> "NASD's claim [was] firmly based on ordinary principles of contract law" because the Fieros had "expressly agreed to comply with all NASD rules, including the imposition of fines and sanctions" when they voluntarily executed the NASD registration forms. The [trial] Court further stated that "New York state courts have long recognized the right of a private membership organization to impose fines on its members, when authorized to do so by statute, charter or by-laws," and that "NASD is not 'just a private club,' but a self-regulatory organization, federally-mandated under . . . the Exchange Act to discipline its members and enforce the federal securities laws as well as its own SEC-approved rules.

*Id.* at 572 (quoting trial court opinion) (citations omitted). The New York inter-

mediate appellate court affirmed, but the highest New York state court "reversed on the ground that the state courts lacked subject matter jurisdiction." *Id.* at 573. That court reasoned "that the FINRA complaint constituted an action to enforce a liability or duty created under the Exchange Act, and therefore, fell within the exclusive jurisdiction of the federal courts pursuant to 15 U.S.C. § 78aa." *Id.* (citing *Financial Industry Regulatory Authority, Inc. v. Fiero,* 10 N.Y.3d 12, 17, 853 N.Y.S.2d 267, 882 N.E.2d 879, 882 (2008) [hereinafter *Fiero II* ] ).

The Fieros then filed a declaratory judgment action in federal district court, seeking a judgment that FINRA lacked the authority to collect fines via court action. *Id.* at 573. FINRA filed, and the court granted, a motion to dismiss the Fieros's claim. *Id.* The court entered judgment in favor of FINRA. *Id.* The Fieros appealed to the Second Circuit, and argued that

> while the Exchange Act and FINRA's rules and bylaws authorize FINRA to impose sanctions on its members, it has no authority to bring judicial actions to collect monetary sanctions. FINRA argues that it has this authority under the Exchange Act and from a FINRA rule submitted to, and not disapproved by, the SEC in 1990.

*Id.* at 574 (citation omitted).

The *Fiero I* Court held that FINRA did not have the authority under the Exchange Act to file a lawsuit to collect a fine imposed pursuant to a rule enacted under the Exchange Act. *Id.* Relying heavily on the post-*Cort* case of *Redington,* the Second Circuit initially observed that the Exchange Act enumerates various private rights of action. *Id.* More specifically, the Exchange Act permits the SEC—and not an SRO—to file suit against any person violating a rule or regulation of the Exchange Act. *Id.* (citing 15 U.S.C. § 78u(d)).

The SEC, however, is barred from filing suit against

"... any person for violation of, or to command compliance with, the rules of a self-regulatory organization ... unless it appears to the Commission that (1) such self-regulatory organization ... is unable or unwilling to take appropriate action against such person in the public interest and for the protection of investors, or (2) such action is otherwise necessary or appropriate in the public interest or for the protection of investors."

*Id.* at 575 (quoting 15 U.S.C. § 78u(f)).[8] Congress, the *Fiero I* Court concluded, "was well aware of how to grant an agency access to the courts to seek judicial enforcement of specific sanctions, including monetary penalties." *Id.* Given the presence of such permissive language, *see Redington*, 442 U.S. at 569–72, 99 S.Ct. at 2485–87, 61 L.Ed.2d at 91–93, and the absence of "explicit provisions in the statute authorizing SRO's to seek judicial enforcement of the variety of sanctions they can impose," the *Fiero I* Court held this was "significant evidence that Congress did not intend to authorize FINRA to seek judicial enforcement to collect its disciplinary fines." *Fiero I*, 660 F.3d at 575.

The *Fiero I* Court also reasoned:
First, FINRA's sanctions are appealable by an aggrieved party to the SEC and thereafter to the United States Courts of Appeals. Had Congress intended judicial enforcement, it would surely have provided for some specific relief other than leaving SRO's to common-law proceedings in state courts or in federal district courts under diversity jurisdiction. Second, where FINRA enforces statutory or administrative rules, or enforces its own rules promulgated pursuant to statutory or administrative au-

thority, it is exercising the powers granted to it under the Exchange Act. Indeed, FINRA's powers in that regard are subject to divestment by the SEC under Section 19(g)(2) of that Act. However, Congress gave the federal courts exclusive jurisdiction to enforce the Exchange Act, 15 U.S.C. § 78aa, and FINRA's breach of contract theory undermines that provision.

FINRA contract enforcement actions may bristle with Exchange Act legal issues because the most serious fines levied by FINRA will be for member violations of the Act. For example, the Fieros were charged with a violation of Section 10(b) of that Act. State court enforcement of FINRA fines might well, therefore, entail interpretation of the Exchange Act notwithstanding the exclusive jurisdiction of the federal courts.

One might argue that an inference of congressional intent to authorize such legal actions by FINRA can be drawn from the seemingly inexplicable nature of a gap in the FINRA enforcement scheme: fines may be levied but not collected. However, the gap does not support an inference of inadvertent omission because significant underenforcement of the securities laws and FINRA rules is hardly the inevitable result of FINRA's inability to bring fine-enforcement actions. FINRA fines are already enforced by a draconian sanction not involving court action. One cannot deal in securities with the public without being a member of FINRA. When a member fails to pay a fine levied by FINRA, FINRA can revoke the member's registration, resulting in exclusion from the industry. Moreover, where a fine is based on a violation of the Ex-

---

8. The *Fiero I* Court, however, acknowledged caselaw "affirming the SEC's authority to enforce FINRA-imposed sanctions" under § 78u(e). *Fiero I*, 660 F.3d at 575.

change Act, the violator will also face a panoply of private and SEC remedies. *See, e.g.,* 15 U.S.C. §§ 77k–77l, 78i, 78j(b).

*Id.* at 575–76 (footnote omitted).

■ We construe *Fiero I* as standing for the following. The Exchange Act permits an SRO to pursue disciplinary action against any member of that SRO. *See id.* at 572. Because of the lack of explicit enabling language, however, an SRO has no authority to bring a private right of action to collect fines imposed as a result of that disciplinary action. *See id.* at 575. As one treatise acknowledged, "it is generally held that violation of a rule of a self regulatory organization will not, by itself, support a private right of action." 5 Thomas Lee Hazen, *The Law of Securities Regulation* § 14.26[2] & n. 29 (6th ed.2009) [hereinafter Hazen] (collecting cases).

Although *Fiero I* is dispositive as to whether an exchange can bring a private right of action to collect fines, the Third Circuit decision of *Walck v. American Stock Exchange, Inc.,* 687 F.2d 778 (3d Cir.1982), is also instructive.[9] In *Walck,* the Third Circuit examined "whether an investor has an implied right of action for damages against a registered stock exchange under [§ ] 6 of the Exchange Act, 15 U.S.C. [§ ] 78f, based on the failure of the exchange to enforce its own rules." *Id.* at 782. "Section 6 provides for SEC registration of any securities exchange that complies with stated requirements,"[10] which include having rules providing for the disciplining of a member. *Id.* at 782–83 (footnote omitted). The *Walck* appellant contended "that an investor injured by an exchange's violation of the registration requirements of [§ ] 6—more precisely, by the exchange's failure to enforce its own rules against an errant member broker— has an implied right of action under that section to recover his damages from the exchange." *Id.* at 783.

The Third Circuit observed that Congress's express creation of private rights of action in §§ 9(e), 16(b), and 18 of the Exchange Act was "strong evidence of congressional intent not to create additional private remedies by implication." *Id.* at 784. The *Walck* Court also suggested that because Congress opted to regulate stock exchanges via self-regulation, it could not conclude that Congress "authorized by implication authority in the federal courts to intervene in the self-regulatory system at the instance of an injured investor...." *Id.* at 786. The Court concluded there was "clear congressional intent not to create a private damages remedy in [§ ] 6." *Id.*

Subsequently, numerous district courts have held "that there is no private right of action for a violation of a stock exchange rule in [the Third] Circuit." *Daniel Boone Area Sch. Dist. v. Lehman Bros., Inc.,* 187 F.Supp.2d 400, 408 (W.D.Pa.2002) ("*Daniel Boone*"). The *Daniel Boone* court cited:

> *Manning v. Maloney,* 787 F.Supp. 433, 436 (M.D.Pa.1992) (No cause of action exists for the violation of NYSE Rules or non-compliance with brokerage firm internal operating procedures.); *Bloch v. Prudential–Bache Securities,* 707 F.Supp. 189, 195 (W.D.Pa.1989) (It seems well settled that no direct cause of action exists for violations of self-regulatory organizations such as the NYSE or NASD.); *Witt v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*

---

9. As previously noted, in the absence of binding high court precedent, it is appropriate for this Court to consider Third Circuit precedent on a federal issue. *See Werner,* 799 A.2d at 782.

10. The *Walck* Court considered the version of § 6 that was then in existence.

602 F.Supp. 867, 869 (W.D.Pa.1985) ( [T]here is no private right of action against defendants, either express or implied, under the New York Stock Exchange and NASD Rules.); *Miller v. E.W. Smith Co.,* 581 F.Supp. 817, 819 (E.D.Pa.1983); *Binkley v. Sheaffer,* 609 F.Supp. 601, 602–03 (E.D.Pa.1985); *In re Farmers Group Stock Options Litig.,* 1989 WL 73245, *3 (E.D.Pa. July 5, 1989).

*Id.*

■ In *Astra USA, Inc. v. Santa Clara County,* 563 U.S. ——, 131 S.Ct. 1342, 179 L.Ed.2d 457 (2011) [hereinafter *Astra*], the high court addressed whether, in the absence of a private right of action, a breach of contract claim could be brought. *Id.* at ——, 131 S.Ct. at 1345, 179 L.Ed.2d at 464. Specifically, it considered whether a cause of action could be brought for breach of a form contract, when the form contract set forth terms identical to that contained within the statute and Congress had not authorized a private right of action for a violation of the statute. *Id.* The *Astra* Court held that the

> absence of a private right to enforce the statutory ... obligations would be rendered meaningless if [the parties to the contract] could overcome that obstacle by suing to enforce the contract's ... obligations instead. The statutory and contractual obligations, in short, are one and the same. *See Grochowski v. Phoenix Construction,* 318 F.3d 80, 86 (C.A.2 2003) (when a government contract confirms a statutory obligation, "a third-party private contract action [to enforce those obligations] would be inconsistent with ... the legislative scheme ... to the same extent as would a cause of action directly under the statute". ...)

*Id.* at ——, 131 S.Ct. at 1348, 179 L.Ed.2d at 467. Thus, if Congress failed to authorize a private right of action to enforce a statute, then a party cannot sidestep legislative intent by suing to enforce a contract imposing the same obligations as those set forth in that statute and, by extension, rule or regulation. *See id.*

■ In this case, we hold that Congress did not explicitly permit the Exchange to initiate a private right of action to collect disciplinary fines imposed by Rule 651. The Exchange Act, similar to § 602 of the Civil Rights Act, authorized the SEC to approve disciplinary rules and regulations that advance fair dealing and investor protection—the purposes of the Exchange Act. *See Dooner,* 601 Pa. at 230, 971 A.2d at 1200; *cf. Sandoval,* 532 U.S. at 285–86, 121 S.Ct. at 1519, 149 L.Ed.2d at 528. Rule 651 is a SEC-approved rule furthering one of the statutory goals of the Exchange Act. *See* 15 U.S.C. § 78f(b)(4); *McMahon,* 482 U.S. at 233, 107 S.Ct. at 2341, 96 L.Ed.2d at 198; *see also Frucher,* 586 F.3d at 246–47.

Based upon the existence of other private rights of action in the Exchange Act, Congress was aware it could authorize judicial enforcement of monetary penalties imposed via disciplinary rules and regulations, including Rule 651. *See Redington,* 442 U.S. at 569–572, 99 S.Ct. at 2485–87, 61 L.Ed.2d at 91–93. Congress, similar to the Congress in *Sandoval,* opted to remain silent about whether courts could enforce such monetary penalties. *Cf. Sandoval,* 532 U.S. at 285–86, 121 S.Ct. at 1519, 149 L.Ed.2d at 528. Because Congress explicitly authorized private rights of action for some sections of the Exchange Act, we will not imply a private right of action to other sections of the Exchange Act that are silent. *See Redington,* 442 U.S. at 569–72, 99 S.Ct. at 2485–87, 61 L.Ed.2d at 91–93. Similar to the *Redington* Court, which also interpreted the Exchange Act, we reject any inquiry into whether an implied private right of action is necessary to effectu-

**314**

ate the purpose of the Exchange Act. *See id.* at 576, 99 S.Ct. at 2489, 61 L.Ed.2d at 96. Further, because the *Walck* Court refused to imply the existence of a private right of action against a stock exchange for failing to enforce its own rules, *see Walck*, 687 F.2d at 786, we similarly refuse to imply the existence of a private right of action by the Exchange against Appellants for violating one of its rules. Indeed, the Exchange has admitted that a Rule 651 claim does not provide for a private right of action in any court. Mem. of Law in Supp. of Pl.'s Mot. for Summ. J., 5/18/09, at 18. Our reasoning and holding is also in harmony with the Second Circuit decision of *Fiero I* and the decisions of the federal courts of this and other Circuits. *See Fiero I*, 660 F.3d at 575; *Daniel Boone*, 187 F.Supp.2d at 408 (collecting cases); *see also* Hazen at § 14.26[2] & n. 29 (collecting cases). Thus, the Exchange's concession and well-settled authority militate against the Exchange's assumption that it had explicit congressional authority to initiate a private right of action to enforce the collection of disciplinary fines imposed by Rule 651. *See Fiero I*, 660 F.3d at 575.

▮▮▮▮ Because the absence of legislatively bestowed authority to initiate a pri-

vate right of action counsels against a finding of jurisdiction, *cf. Barbara*, 99 F.3d at 54, the Exchange cannot pursue a lawsuit.[11] Absent legislative authority to pursue a private right of action, the Exchange is similarly barred from independently raising a claim for breach of a contract—a contract purporting to obligate Appellants to comply with, and pay fines imposed by, Rule 651.[12] *See Astra*, 563 U.S. at ——, 131 S.Ct. at 1348, 179 L.Ed.2d at 467. In sum, Congress did not authorize, and we will not infer such authorization to, the Exchange to pursue a private right of action to obtain judicial enforcement of disciplinary fines imposed by Rule 651, a rule enacted by an SRO pursuant to the Exchange Act.

▮▮▮▮ Assuming, however, that despite congressional silence, the Exchange retains the authority to initiate a private right of action, and that the private right of action is correctly defined as one for breach of contract, we examine whether the courts of this Commonwealth have subject matter jurisdiction over the Exchange's claim for breach of contract. Because that inquiry touches upon federal preemption, we state our Supreme Court's understanding of the law:

there is no basis for a private suit"); *Sandoval*, 532 U.S. at 288, 121 S.Ct. at 1521, 149 L.Ed.2d at 530 (holding statutory language must explicitly create private right of action). "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) (remedies available are those 'that Congress enacted into law')." *Sandoval*, 532 U.S. at 286, 121 S.Ct. at 1519, 149 L.Ed.2d at 528.

12. We do not opine on whether a contract exists, only that the Exchange has no authority to initiate an action for breach of contract.

11. We are aware of *Liss & Marion, P.C. v. Recordex Acquisition Corp.*, 603 Pa. 198, 983 A.2d 652 (2009) [hereinafter *Liss*], in which our Supreme Court held that the absence of evidence of legislative intent to limit or preclude common law causes of action did not foreclose a private right of action for breach of an implied contract. *Id.* at 212, 983 A.2d at 660. In our view, that case is distinguishable because it interpreted a Commonwealth, and not a federal, statute. We would not rely on *Liss* in determining whether a federal statute authorizes a private right of action. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 286, 122 S.Ct. 2268, 2277, 153 L.Ed.2d 309, 323 (2002) (holding, "where the text and structure of a statute provide no indication that Congress intends to create new individual rights,

[F]ederal law is paramount. More specifically, Article VI, cl. 2, of the United States Constitution, the Supremacy Clause, provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, according to the United States Supreme Court, laws that are in conflict with federal law are "without effect." Questions concerning the span of this constitutional matter of preemption, however, are not always easily answered.

In determining the breadth of a federal statute's preemptive effect on state law, we are guided by the tenet that "the purpose of Congress is the ultimate touchstone in every pre-emption case." Congress may demonstrate its intention in various ways. It may do so through express language in the statute (express preemption). Yet, even if a federal law contains an express preemption clause, the inquiry continues as to the substance and the scope of Congress' displacement of the state law.

In the absence of express preemptive language, Congress'[s] intent to preempt all state law in a particular area may be inferred. This is the case where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation. That is to say, Congress intended federal law to occupy the entire legislative field (field preemption), blocking state efforts to regulate within that field.

Finally, even where Congress has not completely displaced state regulation in a specific area, state law is nullified if there is a conflict between state and federal law (conflict preemption). Such a conflict may arise in two contexts. First, there may be conflict preemption where compliance with state and federal law is an impossibility. Furthermore, conflict preemption may also be found when state law stands as an obstacle to the accomplishments and execution of the full purposes and objectives of Congress.

Additionally, concepts of federalism and state sovereignty make clear that in discerning whether Congress intended to preempt state law, there is a presumption against preemption. Specifically, the United States Supreme Court has stated that "it will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intention to do so." Stated another way, a cornerstone of the United States Supreme Court's preemption jurisprudence is that, "[i]n all pre-emption cases, and particularly in those in which Congress has 'legislated ... in a field which the States have traditionally occupied,' ... we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'"

*Dooner,* 601 Pa. at 218–20, 971 A.2d at 1193–94 (most citations omitted); *accord Barnett v. SKF USA, Inc.,* —— Pa. ——, ——, 38 A.3d 770, 776–77 (2012). "Federal preemption is a jurisdictional matter for a state court because it challenges subject matter jurisdiction and the competence of the [state] court to reach the merits of the claims raised." *Werner,* 799 A.2d at 787 (citation omitted). "Federal regulations have no less preemptive effect than federal statutes." *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 699, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580, 589 (1984) (citation omitted).

■ We are bound by the *Dooner* Court's holding that the Exchange Act does not expressly preempt state tort claims. *See Dooner*, 601 Pa. at 233, 971 A.2d at 1202. In arriving at its holding, our Supreme Court relied on the Exchange Act's savings clause:

> In Section 28(a) of the Act, 15 U.S.C. § 78bb, entitled "Effect on existing law," Congress spelled out in very specific terms what law and types of actions are preempted by the statute, broadly preserving state statutory and common law rights and remedies:
>
>> Except as provided in subsection (f) [relating to remedies], **the rights and remedies provided by this title [15 U.S.C. § 78a *et seq.*] shall be in addition to any and all other rights and remedies that may exist at law or in equity;** but no person permitted to maintain a suit for damages under the provisions of this title shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of.
>
> 15 U.S.C. § 78bb(a) (emphasis added).
>
> This language is strong and sweeping.

*Dooner*, 601 Pa. at 223, 971 A.2d at 1196 (citations and footnote omitted).

Based on the savings clause, the *Dooner* Court also held the Exchange Act did not bar a state tort claim via field preemption:

> [E]ven cursory consideration of the history of the Securities Exchange Act supports a state role in serving the broad underlying purposes of the statute.
>
> Related thereto, the structure of the Securities Exchange Act itself suggests no preemption of the entire field of securities regulation as it recognizes state "blue sky" laws and, as noted above, contains a savings clause, which preserves rights and remedies in law and in equity. This savings clause strongly negates the suggestion of field preemption.

*Id.* at 225, 971 A.2d at 1197.

■ Having held no express or field preemption, the *Dooner* Court examined whether conflict preemption nullified the *Dooner* appellants' state tort claims. *See id.* at 226, 971 A.2d at 1198. Conflict preemption arises under one of two bases: (1) when compliance with both state and federal law is impossible, or (2) when state law permits claims that the resolution of would obstruct "the accomplishments and execution of the full purposes and objectives of Congress." *Id.* at 220, 971 A.2d at 1194.

Based on its understanding of conflict preemption, the *Dooner* Court concluded that the state law tort claims at issue could co-exist with the exchange's rules and regulations. *Id.* at 230, 971 A.2d at 1200. Similarly, our Supreme Court held, enforcement of state tort law interferes minimally, if at all, with the twin purposes of such disciplinary rules, particularly when the Exchange Act does not provide for damages for a victim of a tort. *Id.* at 231, 971 A.2d at 1201. Thus, rules and regulations promulgated under the Exchange Act's authority and the Act itself did not preempt the state tort claims at issue, and consequently, our courts had subject matter jurisdiction. *Id.* at 232–33, 971 A.2d at 1202; *Werner*, 799 A.2d at 787. The *Dooner* Court, however, did not address whether the federal Exchange Act preempts state law breach of contract claims.[13]

---

**13.** The *Dooner* Court also did not have to resolve whether the plaintiff had the authority to bring a tort claim.

The United States Court of Appeals for the District of Columbia addressed that issue in *In re Series 7 Broker Qualification Exam Scoring Litigation*, 548 F.3d 110 (D.C.Cir.2008) [hereinafter *Series 7*].[14] NASD is an SRO that administers the Series 7 exam. *Id.* at 111. Similar to the bar exam for attorneys, "[a]ny individual wishing to buy, sell, or solicit securities products must first take and pass an entry-level examination known as the Series 7." *In re Series 7 Broker Qualification Exam Scoring Litig.*, 510 F.Supp.2d 35, 36 (D.D.C.2007). NASD hired Electronic Data Systems ("EDS") "for technical services related to the administration of the Series 7 exam." *Series 7*, 548 F.3d at 111. An EDS technician erred, resulting in incorrect exam scores. *Id.* at 112. Some of the Series 7 test-takers who received incorrect scores filed multiple suits against NASD and EDS, and eventually those suits were consolidated into a nationwide class action. *Id.*

The class action alleged claims for "common law breach of contract, negligence, and negligent misrepresentation." *Id.* The plaintiffs conceded there was no federal implied right of action but insisted their state law claims for negligence and breach of contract could proceed. *Id.* at 113. The defendants countered that federal law impliedly preempted the plaintiffs' state law claims and, alternatively, they were immune from suit based on the doctrine of regulatory immunity. *Id.*

The *Series 7* Court addressed "whether common law causes of action can be alleged against a Self–Regulatory Organization ('SRO') for the negligent performance of its duties under" the Exchange Act. *Id.*

at 111. In resolving this issue, the *Series 7* Court discussed several other cases:

> Several other circuits have analyzed whether common law claims can be raised based on an SRO's duties under the Exchange Act. Although the cases do not explicitly rely on preemption, the reasoning of our sister circuits is instructive regarding the preemptive intent of the congressional scheme. In *Barbara v. N.Y. Stock Exch., Inc.*, 99 F.3d 49 (2d Cir.1996), the Second Circuit held the New York Stock Exchange was immune from claims arising out of disciplinary proceedings required under the Exchange Act. *Id.* at 59. "[A]llowing suits against the Exchange arising out of the Exchange's disciplinary functions would clearly stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, namely, to encourage forceful self-regulation of the securities industry." *Id.*
>
> Later, in *Desiderio v. NASD*, 191 F.3d 198 (2d Cir.1999), an applicant rejected for refusing to sign an arbitration clause had her common law tort claim dismissed because "there is no private right of action available under the Securities Exchange Act to redress denials of membership." *Id.* at 208. In *Desiderio*, like in *Barbara*, the Second Circuit found common law causes of action inconsistent with Congress's intent under the Exchange Act.
>
> Similarly, the Ninth Circuit found a common law breach of contract claim could not be raised against NASD because doing so "would allow states to define by common law the regulatory duties of a self-regulatory organization."

---

14. In 1995, the D.C. Circuit handled 37% of the nation's federal agency appeals, which comprised 57% of its overall caseload. Patricia M. Wald, *Judicial Review in Midpassage: The Uneasy Partnership Between% Courts and Agencies Plays On*, 32 Tulsa L.J. 221, 232 n. 66 (1996). Thus, as of 1995, it played a leading role in interpreting federal regulations enacted by federal agencies. *See id.*

*Sparta Surgical Corp. v. NASD*, 159 F.3d 1209, 1215 (9th Cir.1998). The court in *Sparta* felt such a result "cannot co-exist with the Congressional scheme of delegated regulatory authority under the Exchange Act." *Id. See also MM&S Fin., Inc. v. NASD*, 364 F.3d 908, 912 (8th Cir.2004) ("[A]llowing MM & S to assert a private breach of contract claim [against NASD] would vitiate Congress's intent not to allow private rights of action against self-regulatory organizations for violating NASD's own rules."). Though not always explicitly identifying the underlying premise, courts have consistently found Congress's intent under the Exchange Act precludes common law causes of action, and we agree with the reasoning of our sister circuits.

*Id.* at 113–14. Thus, the Court of Appeals for the Second, Eighth, and Ninth Circuits held that the Exchange Act bars a party from pursuing common law causes of action against an SRO. *See id.*

The *Series 7* Court also observed that the statutory structure of the Exchange Act implied "that Congress intended to preclude challenges arising under a statute when those challenges are outside the system of review prescribed by the" Exchange Act. *Id.* at 114. Specifically, "[t]he multiple layers of review" in the Exchange Act, the *Series 7* Court held, "evince Congress's intent" to limit challenges to within that system of review only. *Id.; see also id.* at 112 (citing 15 U.S.C. §§ 78s, 78y).

Had Congress been silent on this issue, a more plausible case for common law suits might be made. But its clear designation of an appellate process [in the Exchange Act] shows a contrary intent: rather than allowing plaintiffs to sue under common law theories, Congress created a self-contained process to review and remedy such complaints.

*Id.* at 114. "By specifically adopting an appeals process which does not provide monetary relief, Congress has displaced claims for relief based on state common law. A common law suit for recovery of monetary damages is merely an 'attempt ... to bypass the Exchange Act' and the process Congress envisioned therein." *Id.* (quoting *MM&S Fin.*, 364 F.3d at 912). In sum, because permitting such claims to proceed would "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," the *Series 7* Court held that the plaintiffs' common law claims were barred by conflict preemption. *Id.* (citation omitted).

After separately holding that SROs have absolute immunity from suit, the *Series 7* Court concluded:

The comprehensive structure set up by Congress is suggestive both of an intent to create immunity for such duties and of an intent to preempt state common law causes of action. The elaboration of duties, allowance of delegation and oversight by the SEC, and multi-layered system of review show Congress's desire to protect SROs from liability for common law suits. "The presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement."

*Id.* at 115 (citation omitted). Thus, the plaintiffs' state common law causes of action for, inter alia, breach of contract for erroneous exam scores, were preempted by Congress's enactment of an appeal system and barred by the regulatory immunity granted to SROs. *Id.* at 115–16; *see also id.* at 114 (citing 15 U.S.C. § 78s(d), which sets forth statutory right to appeal). Although the *Dooner* Court did not address whether the Exchange Act preempted state breach of contract claims against an

SRO, the Second, Eighth, Ninth, and District of Columbia Circuits have implicitly or explicitly held that such claims are barred by conflict preemption. *See id.* at 113–14; *see also Knights of Columbus Council 3152 v. KFS BD, Inc.,* 280 Neb. 904, 912, 791 N.W.2d 317, 325 (2010) (affirming dismissal of breach of contract claim because "[f]ederal courts have exclusive jurisdiction over private suits brought for violations" of Exchange Act); *Orman v. Charles Schwab & Co.,* 179 Ill.2d 282, 227 Ill.Dec. 927, 688 N.E.2d 620, 626 (1997) (holding Exchange Act, via conflict preemption, barred plaintiffs' state-law claims for breach of fiduciary duty and breach of contract); *Guice v. Charles Schwab & Co.,* 89 N.Y.2d 31, 48, 651 N.Y.S.2d 352, 674 N.E.2d 282, 291 (1996) (barring plaintiffs' state claims for breach of fiduciary duty and conversion based on conflict with Exchange Act); *Dahl v. Charles Schwab & Co.,* 545 N.W.2d 918, 925 (Minn.1996) (precluding, because of conflict with Exchange Act, common law agency claims).

▬▬▬▬ Instantly, we ascertain whether the Exchange's breach of contract claim alleging a violation of Rule 651 is subject to conflict preemption.[15] Given the factual congruities with *Series 7,* we similarly hold that the Exchange Act preempts the Exchange's common law cause of action for breach of contract. *See Series 7,* 548 F.3d at 114.[16] In accord with the reasoning of the United States Court of Appeals for the

Second, Eighth, Ninth, and D.C. Circuits, we opine that Congress's explicit enactment of a review process counsels against a holding permitting the Exchange's common law cause of action for breach of contract to proceed. *See id.* at 113–14. Had Congress remained silent, we might have agreed with the Exchange's argument. *See id.* at 114. But Congress did not, and we decline to infer congressional permission to pursue a common law breach of contract action to recover disciplinary fines awarded pursuant to an SRO rule, in addition to those extensive remedies explicitly set forth by Congress in the Exchange Act. *See id.* at 115. In addition to the absence of enabling language, federal courts have exclusive jurisdiction to enforce rules and regulations promulgated under the Exchange Act. *See Fiero I,* 660 F.3d at 576. Thus, because federal courts have exclusive jurisdiction, permitting the instant suit to proceed in state court may require interpretation of the Exchange Act and a potential for inconsistent interpretation.[17] *See id.* Because we discern conflict preemption, we conclude the courts of this Commonwealth have no subject matter jurisdiction over the Exchange's common law cause of action for breach of contract.[18] *See Werner,* 799 A.2d at 787. Accordingly, we vacate the order and remand with instructions to dismiss the Exchange's suit, and deny as moot the Ex-

---

15. We do not discuss whether the Exchange Act explicitly or by inference preempts a state breach of contract claim.

16. We recognize that the Exchange, unlike NASD in *Series 7,* is bringing the cause of action.

17. Assuming subject matter jurisdiction in this Commonwealth and a valid state judgment, if the underlying federally authorized Exchange rule could be later invalidated, then we foresee further litigation to nullify the state judgment. *Cf. PPL Generation, LLC v.*

*Dept. of Envtl. Prot.,* 604 Pa. 326, 343, 986 A.2d 48, 58 (2009) (affirming invalidation of state regulation because it was predicated on federal regulations that federal court held were void *ab initio*).

18. We observe apparent tension between permitting the Exchange to pursue a common law breach of contract action to enforce the collection of fines imposed via an SRO rule and the Exchange's qualified immunity from a common law breach of contract action alleging a failure to enforce an SRO rule.

change's applications for substitution of party.

Order vacated. Matter remanded with instructions. Jurisdiction relinquished.